IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE
June 2, 2017 Session

**IN RE GABRIELLA D., ET AL.**

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Hamilton County**
**Nos. 13-A-193, 13-A-194, 13-A-195      L. Marie Williams, Judge**
_____

**No. E2016-00139-SC-R11-PT – Filed September 29, 2017**
_____

The Tennessee Department of Children's Services ("DCS") removed three children from the custody of their parents and placed them with foster parents in March 2012 because one of the children, an infant, was severely malnourished. By July 2012, the children's mother was cooperating with DCS and complying with a permanency plan that set the goal for the children as reunification with their mother or another relative. The mother continued to comply with the permanency plan for the next sixteen months that the children were in foster care. On the day the children were scheduled to begin a trial home visit with the mother, July 31, 2013, the foster parents filed a petition in circuit court seeking to terminate the mother's parental rights and to adopt the children. After the foster parents filed their petition in circuit court, the juvenile court, which had maintained jurisdiction over the dependency and neglect proceeding, ordered DCS to place the children with the mother for the trial home visit. The circuit court trial on the foster parents' petition did not occur until September 2015. By that time, the children had resided with the mother on a trial basis for two years without incident. The mother, DCS, and the guardian ad litem appointed by the juvenile court in the dependency and neglect proceeding opposed the foster parents' petition. The foster parents and a guardian ad litem appointed by the circuit court sought termination of the mother's parental rights. After the multi-day trial, the trial court dismissed the petition, finding that the foster parents had proven a ground for termination by clear and convincing proof but had failed to establish by clear and convincing proof that termination is in the children's best interests. The foster parents appealed, and the Court of Appeals reversed. We granted the mother's application for permission to appeal and now reverse the judgment of the Court of Appeals and reinstate the trial court's judgment dismissing the foster parents' petition. We conclude that the trial court correctly determined that the proof does not amount to clear and convincing evidence that termination of the mother's parental rights is in the children's best interests.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Judgment of the trial court reinstated**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., AND SHARON G. LEE, HOLLY KIRBY, AND ROGER A. PAGE, JJ., joined.

Rachel M. Wright, Hixson, Tennessee, for the appellant, Carla D.

Susanne Lodico, Chattanooga, Tennessee, for the appellees, Karen P. and Thomas S.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Alexander S. Rieger, Deputy Attorney General; and Kathryn A. Baker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

Sam Byrd, Chattanooga, Tennessee, Guardian Ad Litem.

Cara C. Welsh, Chattanooga, Tennessee, Amicus Curiae and Guardian Ad Litem for the Children in the Hamilton County Juvenile Court.

## OPINION

### I.  Factual and Procedural Background[1]

The appellant, Carla D. ("Mother"), now resides in Hamilton County, Tennessee, which borders Georgia, and has previously resided in Georgia.  Mother has a long history with the child welfare agencies in both Georgia and Tennessee, specifically the Georgia Division of Family and Children's Services ("GDFCS") and DCS.[2]  Mother has five

---

[1] Because this appeal involves minors, all participants will be identified in a manner that protects the privacy of the minors.  State v. Qualls, 482 S.W.3d 1, 4 n.3 (Tenn. 2016).  We note as well that the record and briefs in this appeal were filed under seal in the Court of Appeals and shall remain under seal in this Court.  See Tenn. Ct. App. R. 14.

[2] In an April 9, 2015 order, the trial court ruled that the Georgia records regarding this family were not hearsay and had been properly authenticated but reserved ruling on any other objections to the admissibility of the records until trial.  The Georgia records were submitted as exhibits three through fourteen but were marked for identification only, pending the trial court's ruling on what the parties referred to as a motion *in limine*.  This motion is not in the record on appeal.  The trial court announced it would rule on the motion in its final opinion.  But at the conclusion of the trial, when the trial court asked the parties to provide proposed findings of fact and conclusions of law, counsel for the foster parents asked the trial court to first rule on the motion *in limine*, so the parties would know which facts could be included in the proposed findings.  Counsel for DCS then asked the trial court for permission to brief the

biological children with the same man, Julius D. ("Father").[3] Mother's first child was born December 24, 2004, in Georgia. GDFCS became involved with the family five months later, on May 23, 2005, as a result of an incident of domestic violence that occurred in the presence of the child.

On February 3, 2006, Mother's second child was born addicted to drugs. Fifteen days later, GDFCS took both children into custody after Mother and Father were involved in an automobile accident in eastern Tennessee while under the influence of drugs and while their oldest child was in the vehicle with them. Mother, Father, and the child were transported to a hospital, and hospital personnel would not release the child to Mother and Father because of their intoxication. Mother and Father had tested positive at the hospital for marijuana, benzodiazepines, and methadone, and hospital personnel had to shake them to elicit a response. When GDFCS took the children into custody, the youngest child was still experiencing withdrawal symptoms and had a severe case of thrush, caused, at least in part, by dirty bottles. On September 11, 2007, a Georgia court terminated Mother's and Father's parental rights to these two children, and the children were later adopted by two different families.[4]

---

motion *in limine*. The trial court instructed counsel for all parties to decide whether the issue would be set for a hearing or submitted on briefs and to advise the trial court of their decision. The record on appeal does not contain any document indicating which option the parties agreed upon, nor does it contain any briefs addressing the motion *in limine* or raising additional objections to the admissibility of the Georgia records, nor does it contain any rulings by the trial court on the referenced motion *in limine* or on any additional objections to the admissibility of the Georgia records. Given the pretrial ruling of admissibility and the lack of any subsequent order ruling the Georgia records inadmissible, we have included facts gleaned from those records in this opinion. We note that the parties have also included facts from the Georgia records in their briefs, and that both the trial court and the Court of Appeals included facts from the Georgia records when reciting the factual history of this family.

[3] Father and Mother were married when these children were born and were still married at the time of the hearing in this matter, although Mother had filed for divorce. Father is not a party to this appeal because, as explained hereinafter, a Georgia court terminated his parental rights to the two oldest children in 2007, and Father, with the assistance of counsel, voluntarily surrendered his parental rights to the three youngest children while this matter was pending in the trial court.

[4] In its order terminating Father's and Mother's parental rights the Georgia court found:

The Court has previously found a cause of [child] deprivation [by] substance abuse by the parents. Neither parent has provided six consecutive months [of] negative drug screens nor have they completed a substance abuse treatment program. [Father] has failed to complete anger management counseling. The parents have failed for greater than one year to complete a case plan designed for the reunification of the children with the parents. The parents suffer from mental illness rendering them incapable of properly parenting the children and have failed to seek appropriate mental health treatment. The parents have physically, mentally and emotionally neglected the children and have failed to protect the children from the maternal grandmother who has a criminal history. The

On March 18, 2008, only six months after the Georgia court entered its termination order, Mother gave birth to Gabriella in Tennessee, across the border from where she lived in Georgia. Within a month of Gabriella's birth, GDFCS petitioned the Georgia court, asking the court to order Mother to participate with drug screening, citing Mother's history with GDFCS and history of drug abuse. The record does not reflect the disposition of this petition. But, on June 26, 2008, GDFCS received a report that Mother and Father had been smoking marijuana in Gabriella's presence and also abusing prescription medication. While Georgia law enforcement and GDFCS officials were in the home investigating the complaint, they noticed that Father appeared to be under the influence. He was caring for Gabriella at the time, and he dropped her while moving her from a bed into a nearby infant seat, hitting her head on the side of the infant seat. Law enforcement officers also found drug paraphernalia in the home. Additionally, a count of Mother's and Father's prescription medications revealed far fewer Xanax and Oxycontin pills remaining than what would have remained had the medication been taken as prescribed. GDFCS then took Gabriella into protective custody and placed her for eight months in the home of the family that had adopted one of her older siblings.

After losing custody of Gabriella, Mother began cooperating with Georgia officials and complying with the conditions GDFCS had imposed for her to regain custody of Gabriella. Mother reported to GDFCS that she had separated from Father and was seeking a divorce, and she sought a protective order against Father. Mother completed an alcohol and drug intensive outpatient program, had clean drug screens, and enlisted the assistance of her own mother ("Maternal Grandmother"), who moved from Florida to Georgia to support Mother and help care for Gabriella while Mother worked. On February 2, 2009, Mother regained custody of Gabriella after a Georgia court found that she "had completed her case plan." But, in the order returning custody to Mother, the Georgia court directed GDFCS to provide "aftercare" for Mother and Gabriella for thirty days and also ordered Mother to "ensure" that Father have "no contact" with Gabriella.

Unfortunately, Mother soon violated the Georgia order by returning to Father and resuming her drug use. Not quite eleven months after regaining custody of Gabriella, Mother gave birth to Jude in a Tennessee hospital on December 31, 2009.[5] He was born addicted to drugs. DCS received a referral because of Jude's drug addiction and required Mother to complete an alcohol and drug assessment. Mother satisfied this requirement, and DCS did not remove either Gabriella or Jude from Mother's custody or impose additional requirements.

---

parents have failed for greater than one year to maintain a meaningful and supportive parental bond with the children. The parents have failed to support the children.

[5] As noted, Mother lived at the time in an area of Georgia that borders Hamilton County, Tennessee.

On May 12, 2010, Mother returned to the home she shared with Father to find him unconscious on the floor, and a friend's child, whom the friend had left in Father's care, dead in a travel crib.[6] Father's mother ("Paternal Grandmother") ordinarily cared for Gabriella and Jude in this home while Mother worked, but Paternal Grandmother and the children were not present in the home when this tragedy occurred, so the children were not removed from Mother's custody.

About a month later, in June 2010, DCS received a new referral based on the Georgia order directing Mother to ensure that Gabriella have no contact with Father. DCS removed Gabriella and Jude from Mother's custody. During this removal, Mother had been using drugs and failed a drug screen. Nevertheless, DCS placed the children back with Mother three days later on the condition that she comply with a non-custodial permanency plan that, among other things, required her to stop abusing drugs and to keep the children away from Father until he received treatment for drug use. By August 20, 2010, Mother had passed three drug screens and had informed DCS that Father knew he could not have any contact with the children until he completed drug treatment. DCS returned the children to Mother without supervision or follow-up and closed its case.

But, yet again, not long after regaining custody of the children, Mother returned to Father, resumed using drugs, and became pregnant again. Her fifth child—Chance—was born on September 9, 2011, and he had methadone in his system that Mother had received at the hospital prior to his birth to treat her addiction. Chance weighed six pounds and fourteen ounces at birth. About six months later, on March 5, 2012, Father took Chance to see a doctor, because Chance was not gaining weight. Chance was immediately transported from the doctor's office to the emergency room of a local Tennessee hospital, where he remained for four days. At the time of his admission, Chance weighed only seven pounds and six ounces, having gained only eight ounces since his birth. Chance was diagnosed with severe malnutrition and failure to thrive. Mother, who had been responsible for caring for Chance, claimed that she had been feeding him six to eight ounces of formula, six to eight times daily, along with baby cereal. She said he was not spitting up more than normal and was not having excessive diarrhea. Father reported that Mother knew Chance was not gaining weight properly but refused to seek medical treatment for him, fearing DCS would take custody of the children.

After learning of Chance's malnutrition, DCS removed all three children from Mother's custody on March 5, 2012, and filed a petition in the Juvenile Court of Hamilton County ("Juvenile Court"). The Juvenile Court issued an order of protective custody on March 7, 2012.

---

[6] The record is not entirely clear, but it appears Father's home was located in Tennessee near the Georgia border.

DCS placed the children with the appellees, Karen P. and Thomas S. (collectively "Foster Parents")[7] in east Tennessee. Foster Parents had only recently completed their training and had no prior experience as foster parents. Gabriella and Jude arrived at Foster Parents' home before Chance was released from the hospital. Both children were infested with lice that required a prescription to treat successfully. Neither had been to a doctor in more than eighteen months, and both were far behind on their vaccinations. Jude chewed food and kept it in his cheeks, seemingly out of fear that he would not be fed again for some time. Additionally, the children had no established routine and were accustomed to bedtimes of between midnight and 1:00 a.m. Gabriella, not quite four years old, openly used inappropriate language when speaking to and about her two-year-old brother, but she could not recite the alphabet, spell her own name, or count to ten.

When Chance joined his siblings at Foster Parents' home a few days later, he looked and acted more like a newborn than a six-month-old. He had a distended belly, stick-like arms and legs, and a disproportionately large head, and he appeared emaciated, like "something that you saw on [] a commercial for [starving] children in Africa," according to Foster Mother. Chance could not hold his head up on his own, and he stared blankly and could not follow objects with his eyes. He was described as suffering "developmental delays" by hospital staff and "significantly neurologically impaired" by an expert witness physician.

DCS assigned family services worker Latisha Ball to the case. Ms. Ball assisted in developing the first family permanency plan, signed on March 21, 2012. The permanency plan indicated that Mother and Father had long been addicted to prescription drugs and had attended a methadone clinic off and on for many years. Reunification was listed as the goal of the permanency plan, but it also stated that DCS would not be bound to that goal if the Juvenile Court made a finding of severe abuse. The permanency plan stated that if the Juvenile Court made a finding of severe abuse, DCS would immediately file a motion to be relieved of any obligation to make reasonable efforts at reunifying the children with Mother and Father.[8] The permanency plan required Mother to: (1) complete a mental health intake to determine treatment needs; (2) maintain a safe, stable home for at least six months; (3) complete an alcohol and drug assessment and follow all recommendations; (4) adhere to the plan to wean herself off of methadone, attend aftercare meetings and counseling with her methadone counselor, and not sell methadone wafers to others; (5) submit to random drug screens; (6) sign releases for DCS to obtain progress notes and treatment plans; (7) attend visitation; (8) obtain legal, verifiable means

---

[7] When referring separately to Foster Parents we shall use "Foster Mother" and "Foster Father."

[8] Pursuant to Tennessee Code Annotated section 37-1-166(g)(4) (2014 & Supp. 2017), DCS need not make reasonable efforts to assist a parent whose parental rights have been previously terminated to a sibling or half-sibling of the child, or a parent who has committed severe abuse against the child or any sibling or half-sibling of the child.

of income and provide proof of income; (9) attend all medical appointments with the children and seek medical attention for them when needed; (10) pay child support as ordered; and (11) inform DCS of any change in circumstances.

Mother initially made little progress toward complying with the permanency plan. Foster Mother said that, at one of Jude's medical appointments, Mother appeared "kind of out of it, slurring her words, [and] not steady on her feet," "as if she was on some sort of narcotic." At a medical appointment to evaluate Jude's motor and cognitive skills, Mother indicated that Jude had no relevant medical history and failed to tell the nurse that he had been born addicted to drugs. Foster Mother had to step in and inform the nurse of this medical information. Mother also brought a photo album for the children to keep while in foster care, which included what Foster Mother believed were inappropriate photographs. In one of the photos, Father appeared to be holding a "joint." Another photo taken before DCS removed the children showed Jude holding an emaciated Chance.

Because Mother initially failed to comply with the permanency plan, Ms. Ball discussed adoption with Foster Parents and told them that DCS planned to amend its petition in Juvenile Court to allege severe child abuse.[9] However, this conversation occurred before Mother's conduct changed in July 2012, after she and Father separated. Mother then asked for and received separate visitation, began complying with her permanency plan, and had no more positive drug screens after June 6, 2012.

On September 5, 2012, Ms. Ball submitted a confidential report to the Juvenile Court, summarizing the progress that had been made. Ms. Ball stated that the permanency goal for each child was to "[e]xit [c]ustody to [l]ive with [r]elatives/[r]eunification." Mother was living in Georgia with Maternal Grandmother, and Father was living in Tennessee at that time. On September 26, 2012, Ms. Ball prepared a "Case Recording Summary" in which she stated that Foster Parents were "very upset that the [Juvenile Court] did not make a finding of severe abuse." According to Ms. Ball, Foster Mother expressed her intent to ask Mother to allow Foster Parents to adopt the children, expressed her dislike of the in-home worker Family Menders had assigned to Mother, and stated that Mother and Father should not be taught parenting skills because they should already know them.

---

[9] Although the record of the Juvenile Court proceeding is not included in the record on appeal, it is undisputed that DCS ultimately did not amend its petition in Juvenile Court to allege severe abuse. Some testimony in the record on appeal indicates that the amendment was an oversight that occurred when the DCS attorney initially assigned to the case left DCS and another attorney took over the case. Whether the amendment was omitted as an intentional, considered decision or through oversight, the fact remains that the petition was not amended.

In the fall of 2012, DCS attempted to place the children with Mother, who was then living with Maternal Grandmother in Georgia.[10] To do so, the Interstate Compact on Placement of Children Act required DCS to obtain the approval of GDFCS for the placement.[11] In a letter dated October 3, 2012, GDFCS refused to approve DCS's request, stating that Mother "appear[ed] to be continuing the pattern of behavior" that had resulted in the termination of her parental rights to her oldest two children.

At the end of October 2012, Ms. Ball transferred to another position within DCS, and in November 2012, another DCS family services worker, Kelly Dyer, was assigned to Mother's case. Ms. Dyer had worked as a case manager for DCS for eleven years. After learning that GDFCS had already refused the DCS request to place the children with Mother in Georgia, Ms. Dyer advised Mother to obtain suitable and appropriate housing in Tennessee.[12] Ms. Dyer also continued to assist Mother in making progress on completing the tasks required in the permanency plan. According to Ms. Dyer, Mother completed all the tasks required by the permanency plan, including ongoing alcohol and drug education, Narcotics Anonymous meetings, random drug screens, and completion of a program titled "Celebrate Recovery." Mother also visited with the children and obtained and kept employment.

Based on Mother's progress on the permanency plan, Mother had been granted unsupervised visitation with the children around September of 2012, before Ms. Dyer was assigned to the case. After receiving the case assignment, Ms. Dyer often made unannounced visits to Mother's home when the children were visiting. Ms. Dyer observed Mother cooking and feeding the children substantive, appropriate food, and she also saw Mother and the children playing together and interacting appropriately. According to Ms. Dyer, the children were attached to Mother, and Mother's home was clean and appropriate for the children. Ms. Dyer occasionally transported the children to and from their visits with Mother. She described Gabriella as eager to visit Mother and upset when the visits ended and the time came to return to Foster Parents' home.

In contrast, Foster Mother stated that Gabriella initially became upset and did not want to participate in extended visitation with Mother. According to Foster Mother, after the unsupervised visits began, the children regressed to the behaviors they had exhibited upon first arriving at Foster Parents' home, although their behavior would normalize after a few days back with Foster Parents.

---

[10] The record on appeal is not entirely clear whether the placement would have officially been with Mother or Maternal Grandmother, because they were living together.

[11] Tenn. Code Ann. § 37-4-201 art. III(d) (2014 & Supp. 2016).

[12] Ms. Dyer stated that it was not uncommon for Georgia to disapprove DCS requests for placement pursuant to the Interstate Compact on the Placement of Children Act.

On February 27, 2013, the Juvenile Court held a permanency hearing and found that Mother was in substantial compliance with her permanency plan—meaning that she had cooperated with DCS, completed alcohol and drug treatment, passed random drug screens, obtained employment, and no longer resided with Father. The Juvenile Court found that the primary barrier to reunification at that time was Mother's lack of appropriate housing in Tennessee.

Shortly after the permanency hearing, Mother obtained appropriate housing in Tennessee. Ms. Dyer stated that Maternal Grandmother and Mother's brother ("Uncle") moved to Tennessee as well to assist Mother. Uncle lived with Mother. Ms. Dyer observed the children interacting with these relatives and believed that, with the help of Maternal Grandmother and Uncle, Mother had established a strong family support system for herself and the children.

In March 2013, DCS conducted an internal review, confirmed that Mother was continuing to comply with her permanency plan, and confirmed that the goal remained reunification. In June 2013, the children's unsupervised visits with Mother transitioned and expanded to overnight visits. Soon after, DCS began developing a timeline for placing the children with Mother on a trial basis. Acting on the recommendations of the therapist for the children, DCS planned to stagger the children's trial return to Mother's home, referred to as a "trial home visit," with Gabriella going first, followed a few weeks later by Jude, followed a few weeks later by Chance. DCS settled on July 31, 2013, as the date to begin the trial home visit, with the target date for reunification set as October 2013.

However, on the date the trial home visit was set to begin, July 31, 2013, Foster Parents, who by then had been caring for the children for sixteen months, filed the petition in circuit court from which this appeal arises, seeking to terminate Mother's parental rights and to adopt the children. As statutory grounds for termination, Foster Parents alleged that Mother had committed severe abuse against Chance as evidenced by his severe malnutrition at the time of removal.[13] Foster Parents further alleged that terminating Mother's parental rights was in the best interests of all the children.

Within a short time after Foster Parents filed their petition, the juvenile court guardian ad litem filed a petition asking the Juvenile Court to conduct an immediate

---

[13] Tenn. Code Ann. § 37-1-102(b)(22) (Supp. 2017). Foster Parents also alleged as another ground for termination that the conditions leading to the removal of the children had persisted. The trial court found that Foster Parents failed to prove this ground by clear and convincing evidence, and Foster Parents have not challenged this finding on appeal.

review of the circumstances and placement of the children.[14]   Additionally, on September 4, 2013, Mother was arrested and charged with aggravated child abuse of Chance due to his severe malnutrition in March of 2012.[15]

The Juvenile Court hearing on the petition filed by the juvenile court guardian ad litem occurred on September 27, September 30, and October 2, 2013. The Juvenile Court entered its order on the petition on November 11, 2013. In this order, admitted as an exhibit below in this proceeding, the Juvenile Court found that DCS left the children in an improper placement too long because the children remained in Foster Parents' home after Foster Parents voided their contract with DCS by filing this parental termination action. The Juvenile Court further found that DCS should have initiated the trial home visit with Mother as planned in July 2013, despite Foster Parents' filing the termination and adoption petition in circuit court. The Juvenile Court set a further hearing to review the status of the trial home visit with Mother, to review the need for a future adjudicatory hearing, should the trial home visit not succeed, and to review the status of Foster Parents' termination and adoption petition, which the Juvenile Court "believe[d] should be dismissed." Although the Juvenile Court's order was not entered until November 2013, the record reflects that the children actually began residing with Mother in either late September 2013, or by no later than October 2, 2013.

On March 26, 2014, Mother resolved the criminal charges that were filed against her on September 6, 2013, by pleading guilty to attempted child neglect, a Class A misdemeanor. She received a sentence of eleven months and twenty-nine days, but she was allowed to serve the sentence on probation. Specifically, Mother was ordered to complete six months of supervised probation followed by six months of unsupervised probation.

According to Melanie Benson, the probation officer who supervised Mother's probation from March to September 2014, Mother was required to call a "drug line" daily during this time and learn whether she had been selected to submit to random drug testing. If selected, Mother had one day to report for the drug screen. Although Mother had tested positive for hydrocodone on one drug screen during her supervised probation, Mother had provided a corresponding prescription for the drug that explained the positive drug screen. Mother was also required to pay all probation supervision fees and court costs and to provide proof of employment and any prescriptions she had received that

---

[14] When an adoption petition is filed, the adoption court receives exclusive jurisdiction of all matters pertaining to the child except that the juvenile court retains jurisdiction "to the extent needed to complete any reviews or permanency hearings for children in foster care as may be mandated by federal or state law." Tenn. Code Ann. §§ 36-1-116(f) (2017), 37-1-103(c) (2014 & Supp. 2017).

[15] According to the November 11, 2013 order, Mother was arrested outside the Juvenile Court on her way to a hearing in the Juvenile Court.

would result in a positive drug screen. Mother fully complied with and completed her probation—completing supervised probation on September 30, 2014, and completing unsupervised probation by the end of March 2015.

For various reasons,[16] the trial in circuit court on Foster Parents' petition to terminate Mother's parental rights did not occur until September 8-10, 2015. By that time, as already noted, Mother had completed her probation, and the children had been residing with Mother without incident for about two years.[17]

The proof offered at the circuit court trial established that Foster Parents had been skeptical about the reunification goal since early in the case. The first DCS family services worker assigned to the case, Ms. Ball, had broached the subject of adoption with Foster Parents and indicated that DCS intended to ask the Juvenile Court to make a finding of severe abuse. But DCS ultimately did not seek a finding of severe abuse in Juvenile Court. Foster Parents believed that DCS should have sought that finding, and they grew more dissatisfied with the goal of reunification as the case progressed, their love, affection, and bond with the children grew, and their concerns about Mother's parenting skills persisted and deepened. Foster Mother also related specific incidents that caused her concern. She reported each of these incidents to Ms. Dyer. On one occasion, Mother had picked up the children from daycare for a visit in the morning, taken them to a restaurant for pancakes before the normal lunch hours, and returned them to daycare after lunch, without informing the daycare that the children had not eaten lunch. When Foster Mother picked up the children from daycare, the children, particularly Gabriella, complained of hunger.

Ms. Dyer investigated this incident and learned that the children had eaten breakfast at Foster Parents' home and again at the daycare, before having pancakes with Mother. The children had also received an afternoon snack after Mother returned them to daycare. Although Ms. Dyer counseled Mother about the incident, she did not view it as a resumption of the problems that had resulted in Chance's malnourishment because the children had eaten three meals by the time Mother returned them to daycare.

---

[16] Foster Parents argue that this delay resulted from DCS's failure to comply with discovery requests, and they point to statements by the trial court supporting their argument. DCS insists that the delay resulted from Foster Parents twice amending their petition and failing to effect service of process on Father in a timely manner, even though he was incarcerated and easy to locate. We need not resolve where the blame lies for this delay but wish to emphasize that delays should always be avoided where the permanent placement of children is at issue.

[17] Nearly two more years have passed since the conclusion of the trial, and the children apparently are still residing with Mother.

Foster Mother described another incident where Mother brought Jude back to daycare with a 104 degree fever but failed to inform the daycare of his condition. According to Foster Mother, the daycare staff realized almost immediately that Jude was not well and called Foster Parents, who took him to a doctor. Foster Mother related that, on another occasion, Chance returned after an overnight visit with Mother and had what Foster Mother described as "one of the worst cases of diaper rash" he had suffered since his placement with Foster Parents.

Ms. Dyer testified that she investigated all the many incidents Foster Parents reported to her and did not consider any of them to be grounds for not returning the children to Mother. According to Ms. Dyer, Foster Parents became less willing to cooperate with DCS as the date to return the children to Mother's home on a trial basis approached and reunification became more of a reality.

Foster Parents also described how their affection for the children and the children's affection for them developed and deepened. Gabriella and Jude initially referred to Foster Parents as "Ms. Karen" and "Mr. Tommy." But eventually, on their own and without prompting, the children began referring to Foster Parents as "mommy" and "daddy." On one occasion after the children had moved back to Mother's home, Jude told Ms. Dyer he missed "Mr. Tommy" and asked her to tell "Mr. Tommy" he said "hi."

Foster Parents also described how the children had thrived in their care, with Chance's weight returning to normal and his developmental delays addressed with eighteen months of "extensive" physical therapy that Foster Parents helped him complete. By the time Jude, age three, left Foster Parents' home, he had already acquired many of the skills that Gabriella had lacked when she came to Foster Parents' home at age four. For example, Jude could count to ten, spell his name, and recite the alphabet, all tasks Gabriella could not complete at age four.

Gabriella too had thrived in Foster Parents' care. She enrolled in kindergarten in the summer of 2013, while still with Foster Parents. She achieved one of the highest scores on the entrance test administered to students at the beginning of the year. Ms. Patty Keller, a teacher with thirty years' experience and Gabriella's kindergarten teacher before she left Foster Parents' home in late September or early October,[18] described Gabriella as a "perfect" student, the "star" of her class, and an "amazing" little girl who was "joyful" and "talkative." Ms. Keller stated that Foster Parents were very involved in Gabriella's education, and very protective of Gabriella. Ms. Keller had initially assumed Foster Parents "were her biological parents" because she was so "relaxed and happy with them." Ms. Keller never witnessed Foster Parents being negative toward Mother in Gabriella's presence. But, Ms. Keller stated that Gabriella became visibly upset upon

_____
[18] Ms. Keller testified by deposition.

learning that she would be returning to Mother's home, began acting out, and changed from being talkative and happy to being tense, stiff, nervous, and anxious.

Foster Parents also described how Gabriella's behavior changed as the children's visits with Mother increased in duration and frequency. They testified that Gabriella became "sullen," anxious, angry, sad, and tearful and started "acting out" and "completely shut[ting] down" at other times. Gabriella also began hoarding food, something she had not done since her earliest days in foster care. When Ms. Keller asked Gabriella why she was hoarding food, Gabriella responded, "Because I don't get food." When Ms. Keller replied, "But, Gabby, I'm sure you get food," Gabriella responded, "Well, could I just save this? I want to share this with my brother. . . ." When Ms. Keller stated, "I'm sure your mom will give you food at home," Gabriella said, "Sometimes, no."

Foster Parents did not dispute that Mother had complied with the permanency plan. But they viewed her compliance as another instance in Mother's long history of dealing with child protective agencies and of meeting the requirements just long enough to regain custody of the children, but all the while intending to return to Father and drug abuse when DCS's involvement ends.

To establish the alleged ground for termination of severe abuse, Foster Parents offered the testimony of Dr. Paul Dassow, an expert in family medicine and pediatric care. Dr. Dassow spends thirty percent of his time teaching and seventy percent of his time seeing patients. Approximately twenty-five percent of his patients are newborns and children. Dr. Dassow reviewed Chance's medical records and opined that Chance's malnutrition had been life threatening. Dr. Dassow described Mother's claim that she had given Chance formula in appropriate amounts multiple times daily as a "medical impossibility." According to Dr. Dassow, babies typically gain eight pounds during their first six months. Dr. Dassow found no medical reason in Chance's medical records, such as acid reflux, vomiting, or inability to absorb food, to explain Chance's failure to gain weight normally during the first six months of his life. Dr. Dassow pointed out that Chance had gained three pounds his first month in foster care, had gained four more pounds by May 11, 2012, and had continued gaining weight thereafter at a normal rate. Dr. Dassow described Chance's situation as the "worst case of malnutrition in any six-month-old that" he had "ever seen . . . including cases in Africa that resulted in infant death." Dr. Dassow stated that when he saw Chance's weight listed in the records, he thought it was a misprint. After learning it was not an error, Dr. Dassow was "surprised" to learn that Chance had survived. Dr. Dassow explained that Chance's weight at six months was literally off the charts—"shockingly below the oneth percentile" of a child growth chart published by the World Health Organization. Dr. Dassow stated that children who suffer severe malnutrition during the first six months of life often have developmental delays with social interactions, neurocognitive delays, and intellectual disabilities, although these problems typically are not discovered until children start

school. These children are also at a higher risk of death, persisting into adulthood, including a greater risk of heart issues. Dr. Dassow opined that Chance was neglected to the extent that he was at risk of suffering serious bodily injury or death. But, Dr. Dassow had never met or examined Chance and could not reach an opinion on whether Chance actually had suffered any persistent developmental delays, intellectual disabilities, and/or impairments.

Ms. Sara Starla Landrum, a teacher with ten years' experience, had been Gabriella's kindergarten teacher after the children began residing with Mother in late September or early October 2013. Ms. Landrum testified in person at the circuit court trial, describing Gabriella as happy, bright, gifted, healthy, and clean. She said Gabriella had good attendance her kindergarten year, was on time for school, and was well fed. Gabriella had lots of friends and was socially appropriate. Ms. Landrum said that Gabriella had achieved a reading level "well beyond the end of the first grade level" by the time she finished kindergarten.

By the time of the trial in circuit court, Jude was a student in Ms. Landrum's kindergarten class and had also been her student in a summer program before kindergarten. Ms. Landrum described Jude as interacting well with other children. She said that an ADHD diagnosis he had received had not interfered with his ability to learn because his caretakers ensured that he received his medication daily before school. She said Jude knew the alphabet coming into the summer program and that he is well cared for, happy, healthy, always clean, and on time for school. She described Jude as "just a normal five-year-old boy," who is "very active" and "plays" but is also "able to sit and do his work."

Ms. Tiffany Welch, Gabriella's first grade teacher, also testified live at the hearing. She described Gabriella as a very bright, friendly child, and a helper to her teachers. Gabriella had only five absences in first grade and was tardy four times, which the teacher characterized as "pretty good" for a first grader. Ms. Welch agreed that Gabriella was "very advanced" intellectually. She also described Gabriella as always in dress code, always clean and well cared for, always well fed and never complaining of being hungry, "a great kid," "friends with everybody," and "always doing the right thing." Ms. Welch had referred Gabriella for gifted testing, which is an unusual referral for a first grader. Gabriella tested as gifted.

Both teachers testified that Mother, Maternal Grandmother, and Uncle communicate with them often, provide the children with appropriate and strong support, and complete the tasks required of them, such as signing homework assignments and responding to notes teachers sent home.

Cheryl Gebelein, a parent educator with Family Menders, also testified at the circuit court trial. She began working with Mother in the fall of 2012, providing in-home services and, over the next two years, they covered a variety of topics, including proper supervision of children, proper nutrition, healthy relationships, domestic abuse, respect and responsibility, alcohol and drug awareness, age-appropriate discipline, and medical care for children. Ms. Gebelein addressed alcohol and drug counseling at every session. Mother had remained fully compliant with the Family Menders in-home services plan during this entire time. The results of Mother's random drug screens, which were a requirement of the Family Menders plan, convinced Ms. Gebelein that Mother was clean, sober, and making progress. She had given Mother "a number of drug screens . . . and they all came back clean." Ms. Gebelein never saw Mother impaired and never saw any other indications of drug relapse, such as drug paraphernalia in Mother's home. Ms. Gebelein observed Mother interacting with the children on a consistent basis during this two-year period, making a point to drop by Mother's home unannounced twice each week on average, and never failing to stop by at least once every week. She made a point too of stopping by around the time Mother was getting home from work and had seen Mother cooking dinner a number of times. According to Ms. Gebelein, Mother appropriately cared for and interacted with the children, and the children were well fed. Ms. Gebelein believed that Mother no longer needs in-home services, and she was satisfied that Mother is sober and that the alcohol and drug counseling, as well as the domestic-violence counseling, has been effective.

Ms. Dyer, the DCS family services worker assigned to the case since November 2012, explained that even at the time of the trial in circuit court, she was still making visits to Mother's home, communicating with Mother by texts and phone calls, visiting with the children, and contacting providers to monitor Mother's progress. Ms. Dyer explained that she is required to visit the home at least once monthly and to see the children at the home or elsewhere at least twice monthly. Based on her observation and monitoring of the case, Ms. Dyer testified that the children need to remain with Mother. Ms. Dyer was satisfied that the malnourishment that resulted in their removal from Mother's custody is no longer a concern. She pointed out that the children had gained and maintained weight in Mother's care. Ms. Dyer was not concerned that Mother would relapse to drug abuse or return to Father. Ms. Dyer emphasized that Mother has remained separated from Father and drug free longer than she ever had previously, and Mother had filed for divorce. She emphasized Mother's strong family support system. Uncle lives with Mother and assists with supervising the children. Maternal Grandmother helps with caring for the children and takes them to doctor, dentist, and counseling appointments. Ms. Dyer also believed that the lengthy court hearings had taught Mother perseverance and resiliency, and she noted that Mother had continued to comply with the permanency plan and care for the children throughout the court proceedings. Ms. Dyer opined that Mother had worked her permanency plan "three times over," consistently complying with it and meeting stated goals. Ms. Dyer believed that Mother is ready to have legal custody of the children. Ms. Dyer stated that the children

are attached to Mother and that "the best outcomes are when children can be reunited with their family." When asked whether reuniting children with parents is "rare," Ms. Dyer responded, "I can't say that I don't return children, but mom got on the ball and she got it done and she continues to do it. So I don't have any complaints. I really don't."

DCS Team Coordinator Susan Jaquith became involved with the case as the children were transitioning from Foster Parents to live with Mother. Ms. Jaquith, a social worker with over thirty years' experience, testified by stipulation as an expert in social work. She opined that the children "have been with [Mother] for two years" and that it would "be extremely traumatic, very traumatic, for the children" to be removed from Mother.

Dr. Alice Greaves also testified in person at the trial. Dr. Greaves has a doctorate in clinical psychology and is a psychological examiner at the Center for Individual and Family Effectiveness. All counsel stipulated that Dr. Greaves was qualified to testify as an expert in clinical psychology. Dr. Greaves conducted a parenting assessment with Mother on May 8, 2013, more than two years before the hearing in circuit court. At the time of Dr. Greaves' assessment, Mother "had met her responsibilities," "passed her drug screens," was no longer involved with Father, was working full time, had health insurance, and had a place to live. Dr. Greaves described Mother's compliance with the permanency plan as "commendable" and noted that full compliance "doesn't happen on a regular basis" with parents who have children removed from their custody. Although Dr. Greaves diagnosed Mother with polysubstance dependence sustained full remission, anxiety disorder, and personality disorder, with dependent and avoidant features, Dr. Greaves concluded that Mother's mental health diagnoses and past substance abuse do not prevent Mother from parenting the children. Dr. Greaves acknowledged, however, that should Mother relapse, it could cause substantial harm to the children. Accordingly, Dr. Greaves recommended that Mother engage in individual therapy, complete alcohol and drug rehabilitation, complete domestic-violence counseling, and take parenting classes, if she had not already done so at that time. Given Mother's history of drug abuse, Dr. Greaves recommended individual counseling because she believed psychiatric treatment might pose a temptation for Mother to seek psychiatric drugs. DCS considered Mother to be in full compliance with Dr. Greaves' recommendations because Mother had cooperated with and participated in these recommended services since 2012, and for two more years after Dr. Greaves' evaluation and recommendation. Dr. Greaves opined that Mother has the ability to stay away from Father and saw no indication Mother would return to Father. However, Dr. Greaves was unaware that Mother had immediately returned to Father in the past after completing permanency plans and of the family history of involvement with GDFCS and DCS, although Dr. Greaves was aware of the previous termination of Mother's parental rights in Georgia. Dr. Greaves testified that knowing these facts, she would also recommend "some long-term involvement, like in-home services, over the first couple of years that the children were back [with Mother] . . . to monitor the situation." By the time of trial, the children had already been back with

Mother for two years, and DCS had been monitoring the situation and providing services during that time.

A few days before the trial in circuit court, Mother broke a bone in her foot at work and received treatment at an emergency room. Mother also had two dental surgeries in the year preceding the trial and had received treatment twice at an emergency room for a large abscess on her arm. On each of these five occasions, Mother had received a short term prescription for narcotic pain medication to treat the pain from the acute injury or procedure. Mother had failed to inform the treating medical professionals of her history of drug abuse, and on the intake forms she completed, Mother had checked the boxes indicating that she had no history of drug abuse. Mother also had failed to request non-narcotic pain medications. But Mother had notified Ms. Dyer after receiving these prescriptions. Dr. Greaves opined that receiving prescription medication and using it as prescribed for an acute injury or surgery is not considered a relapse to drug abuse. According to Dr. Greaves, a person who has a negative drug screen for two years, lives in the same house, stays away from the abusive person in her life, and engages in alcohol and drug treatment is a success in the treatment process. Dr. Greaves agreed, however, that it would be troubling to learn that a person with a history of drug abuse had failed to disclose her history or failed to ask for non-narcotic medication, as Mother did here, saying it would not be "wise" behavior.

Dr. Irene Ozbek, an expert in rehabilitative psychology and pediatric rehabilitation, performed a bonding study on Mother and the children on March 4, 2015, six months before the hearing in circuit court. Dr. Ozbek was deposed on April 17, 2015, and her deposition testimony was introduced at trial. Dr. Ozbek opined that the children are bonded and attached to their mother and have positive relationships with Uncle. Dr. Ozbek stated that Mother handles the children very well and uses appropriate discipline. The children did not display insecure or anxious behavior of any kind and did not seem afraid of Mother. Rather, they listened to her and followed her directions. Dr. Ozbek did not observe "anything that would suggest a developmental delay except for the ADD signs" in Chance, although she did not perform a formal assessment of his functioning. Chance also appeared to be well fed. Gabriella and Jude told Dr. Ozbek they want to live with Mother. Dr. Ozbek opined that Mother and the children are a family unit and said that the children are settled into a functioning family structure. Dr. Ozbek opined that removing the children from Mother and changing caretakers again would have a negative effect on the children. Dr. Ozbek believed that if the children were removed from Mother, it would be a loss for all three children, but particularly for Gabriella and Jude. Dr. Ozbek stated that terminating Mother's parental rights is not in the children's best interests. Mother informed Dr. Ozbek that she was no longer attending group meetings for drug recovery but was attending group meetings for people who had been involved in relationships where there was domestic violence. Dr. Ozbek stated that Mother's decision to attend group domestic violence meetings rather than drug recovery meetings was not a concern, given the constraints on Mother's time, and would be a concern only if other

issues were occurring. Like Dr. Greaves, Dr. Ozbek expressed concern upon learning that Mother had not told her treating physicians about her history of drug abuse and said it was Mother's responsibility to do so. Dr. Ozbek also stated that, considering Mother's history of drug abuse, Mother should have requested an alternative medication for pain control. Dr. Ozbek also noted inconsistencies in Mother's statements about Father. For example, although Mother professed to have no knowledge of Father, she was aware that Father was in a relationship with another woman.[19] Mother also had not informed Dr. Ozbek about an incident where Father called Mother's cell phone and spoke with Jude, but Mother told the children not to tell anyone that Father had called. Dr. Ozbek described the incident as "a problem" and acknowledged that Mother returning to Father was "a realistic possibility . . . based on prior patterns." Dr. Ozbek recommended that Father's parental rights be terminated and/or that Mother obtain a divorce. Based on Mother's history and the severity of her past problems, Dr. Ozbek recommended continued monitoring and supervision of the family for one year, so the children would "have a safety net." She described the type of monitoring as a "monthly check with an external agency that has access to all three children." Five months passed between the date Dr. Ozbek made this recommendation and the date of trial, and during this time, DCS monitored and supervised Mother and the children.

Mother testified that she was certain that she would be able to maintain the same stable lifestyle she had maintained for years. By the time of trial, Mother had been in the same home for two and a half years and had been "clean and sober" for three years. Additionally, the children had been in Mother's full-time care for two years, with Mother responsible for their clothing, daily care, food, medical care, and schooling. The children were in counseling and were regularly seen by a doctor. When Mother is not working, she spends all her time with the children and family. Mother believed that Gabriella would be devastated were the children removed from her care, and Jude had told Mother that he wants to live with her forever even when he is "grown-up." Although Chance was not in school at the time of trial, he was attending day care and meeting his milestones.

Mother admitted that Father had been a toxic influence in her life. He had physically and mentally abused her, supplied her with drugs, and joined her in abusing drugs. By the time of the circuit court hearing, Mother had filed for divorce from Father, a step she had never taken in the past, although she had previously expressed an intent to do so.[20] Mother had also been separated from Father for longer than she ever had in the past. Regarding the call Father made to Mother's cell phone, Mother stated that she

---

[19] Mother testified that Father had posted about his relationship on social media, and others had told her about the post.

[20] Although the trial court's order states that Mother's divorce was final, the basis of this statement is not included in the record on appeal.

changed her cell phone number and blocked Father on social media after their separation. But, in July 2014, Father called her new cell phone number and Jude answered. When Mother learned the identity of the caller, she hung up. Father called back, and Mother asked why he was calling and how he had gotten her number. Mother insisted at trial that she had not given her number to Father. Mother said she learned that Father had obtained her number from a person on an online dating site to whom Mother had given the number. Mother admitted that she had not informed DCS of Father's call and had told the children not to tell anyone about it. Gabriella had informed Ms. Dyer of the call and of Mother's instructions not to disclose it. Ms. Dyer had spoken with Mother, reiterated that she was to have no contact with Father, and afterwards, Mother again changed her cell phone number. She had not been in contact with Father again.

Mother also acknowledged that she failed to tell medical providers of her history of drug abuse when she received the five short-term prescriptions for opiates during the fourteen months preceding trial. Mother testified that, although she had used all of these medications, she had only used them as prescribed and had not abused them. Mother denied asking for the second prescription she received to treat the abscess. Mother testified that she told the treating physician that she had hydrocodone pills remaining, but he wrote her a prescription for Percocet anyway, saying that the abscess was "really bad." Mother acknowledged having received a prescription for thirty Percocet just prior to trial for pain in her broken foot.

Mother reiterated that she had cooperated with home visits from DCS personnel and from the lawyers appointed guardians ad litem in juvenile and circuit court. According to Mother, the circuit court guardian ad litem had visited her home only twice, and the final visit had occurred a month or two after the children were returned to her home in late September or early October 2013, almost two years before the trial in circuit court. The circuit court guardian ad litem had never visited the children's school. Mother stated that the children are happy, have a good life, and that her own life now is "about [her] kids."

The trial court took the case under advisement and later ruled that Foster Parents had proven by clear and convincing evidence that Chance's malnourishment constituted severe abuse. Nevertheless, the trial court concluded that Foster Parents had failed to establish by clear and convincing evidence that terminating Mother's parental rights is in the best interests of the children.

Foster Parents appealed. The Court of Appeals unanimously affirmed the trial court's finding of severe abuse; however, a majority of the Court of Appeals reversed the trial court's finding that Foster Parents had failed to prove by clear and convincing evidence that terminating Mother's parental rights is in the children's best interests. In re Gabriella D., No. E2016-00139-COA-R3-PT, 2016 WL 6997816, at *1 (Tenn. Ct. App. Nov. 30, 2016), perm. app. granted (Tenn. Mar. 8, 2017). The majority therefore granted

Foster Parents' petition for termination and remanded to the trial court for an adjudication of Foster Parents' adoption petition. Id. Judge Steven Stafford filed a separate opinion concurring with the majority's decision affirming the trial court's finding of severe abuse but dissenting from its reversal of the trial court's finding that termination of Mother's parental rights is not in the best interests of the children. Id. at *20 (Stafford, J., dissenting). Judge Stafford reasoned that the majority had focused too much on the past abuse and neglect and on the possibility that Mother would relapse to drug abuse and return to Father as soon as DCS supervision ended. Id. at *22. Judge Stafford stated that the evidence supported the trial court's finding that the children had been living with Mother for two years without incident prior to the circuit court trial and had bonded with Mother so that their removal from her would be "a loss." Id. Judge Stafford could not "fathom" "how much more incident-free parenting time would be required to persuade the majority that Mother's improvements will be lasting." Id.

Thereafter, Mother filed an application for permission to appeal, which we granted. Tenn. R. App. P. 11.[21]

## II. Standards of Review

The standard of review in Rule 13(d) of the Tennessee Rules of Appellate Procedure applies to an appellate court's review of a trial court's findings of fact in a termination proceeding. In re Carrington H., 483 S.W.3d 507, 523-24 (Tenn. 2016) (citing In re Bernard T., 319 S.W.3d 586, 596 (Tenn. 2010); In re Angela E., 303 S.W.3d 240, 246 (Tenn. 2010)). Under the Rule 13(d) standard, factual findings are reviewed de novo with a presumption of correctness, unless the evidence preponderates otherwise. Id. at 524 (citing In re Bernard T., 319 S.W.3d at 596; In re M.L.P., 281 S.W.3d 387, 393 (Tenn. 2009); In re Adoption of A.M.H., 215 S.W.3d 793, 809 (Tenn. 2007)). A trial court's determination as to whether facts amount to clear and convincing evidence supporting termination of parental rights is a conclusion of law. Id. (citing In re M.L.P., 281 S.W.3d at 393). Thus, an appellate court reviews this determination de novo, affording no deference to the trial court's decision, and makes its own determination as to whether the facts amount to clear and convincing evidence of the elements necessary to terminate parental rights. Id. (citing In re Bernard T., 319 S.W.2d at 596-97). The dispositive issue in this appeal is a question of law: whether the facts presented amount to clear and convincing evidence that termination of Mother's parental rights is in the best interests of the children.

---

[21] Three separate notices of appeals were filed when this matter was appealed to the Court of Appeals, one for each child, and three separate appeals were initiated, even though the circuit court held a single trial addressing Mother's parental rights to all the children and all the parties, counsel, issues, transcripts of evidence, and exhibits for all three cases were the same in all three appeals. In the order granting Mother's application, this Court consolidated these three appeals pursuant to Tennessee Rule of Appellate Procedure 16(a). In re Gabriella D., No. E2016-00139-SC-R11-PT (Tenn. Mar. 8, 2017) (order granting Mother's application and consolidating the appeals).

## III. Analysis

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." In re Carrington H., 483 S.W.3d at 521 (footnote omitted). Parental rights have been described as "far more precious than any property right." Id. at 522 (quoting Santosky v. Kramer, 455 U.S. 745, 758-59 (1982)). But although parental rights are fundamental, precious, and constitutionally protected, they are not absolute. Id. (citing In re Angela E., 303 S.W.3d at 250). Nevertheless, in light of the profound interests and consequences at stake, when judicial proceedings are initiated to terminate parental rights, parents are constitutionally entitled to certain fundamentally fair procedures. Id. (citing Santosky, 455 U.S. at 753-54; Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27, (1981)). As this Court recently explained:

> Among the constitutionally mandated fundamentally fair procedures is a heightened standard of proof—clear and convincing evidence. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings. The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not.

Id. (citations and internal quotation marks omitted). This constitutionally mandated standard of proof is incorporated in a Tennessee statute as well. Tenn. Code Ann. § 36-1-113(b)(1), (c) (Supp 2017).[22] Thus, a party seeking to terminate parental rights in Tennessee must prove two elements by clear and convincing evidence: (1) that at least one statutory ground for termination exists, see id. § 36-1-113(g) (listing the grounds for terminating parental rights); and (2)"[t]hat termination of the parent's . . . rights is in the best interests of the child." Id. § 36-1-113(b)(1), (c).

A trial court adjudicating a petition to terminate parental rights first determines whether at least one ground for termination has been proven by clear and convincing evidence. If so, the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is the best interests of the child. In re Carrington H., 483 S.W.3d at 523 (citing In re Kaliyah S., 455 S.W.3d 533, 555 (Tenn. 2015)). "The best interests analysis is separate from and subsequent to the determination

---

[22] The text of the statute currently in effect is the same as that of the statute in effect of the time of the proceedings in the trial court, except for minor modifications not relevant to this case. Thus, quotations and citations in this opinion are to the current statute.

that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d at 254.

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d at 555 (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 192 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.35 at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In this case, Mother, DCS, and amicus curiae juvenile court guardian ad litem argue that, in reversing the trial court, the Court of Appeals relied too heavily on a single statutory factor, Tennessee Code Annotated section 36-1-113(i)(6), and erroneously minimized the many other statutory factors and substantial evidence indicating that

termination is not in the children's best interests. Foster Parents and the circuit court guardian ad litem contend that the Court of Appeals correctly reversed the trial court and determined that termination is in the best interests of the children.

Having carefully reviewed the record, we conclude that the Court of Appeals erred by reversing the trial court's determination that the combined weight of the facts does not amount to clear and convincing evidence that termination is in the children's best interests. We begin by agreeing with the Court of Appeals that Mother's parenting skills were essentially nonexistent in the years before the children were removed from her custody in March 2012 and, indeed, even afterwards, until Mother separated herself from Father in July 2012. During this time, Mother's energies and efforts were focused much more on abusing drugs and continuing her abusive and toxic relationship with Father than on parenting her children. The combined weight of the factual evidence very clearly and convincingly established that Mother's neglect, exacerbated by drug abuse, resulted in Chance's severe abuse.

Nevertheless, the proof offered at trial also establishes that, "[n]ot all parental misconduct is irredeemable." In re Audrey S., 182 S.W.3d at 877. Although Mother did not bear the burden of proof in this termination proceeding, she offered proof touching upon each of the statutory factors that are to be considered in the best interests analysis. The record on appeal, evaluated in its entirety, simply does not contain clear and convincing evidence establishing that termination is in the children's best interests. Rather, the combined weight of the factual proof comes much closer to amounting to clear and convincing evidence of just the opposite conclusion—that termination is not in the children's best interests. A detailed and comprehensive recitation of the proof has already been provided and will not be repeated. However, providing a brief analysis of the proof as it relates to each of the nine statutory factors is necessary to more clearly illustrate how the factual proof falls far short of amounting to clear and convincing evidence that termination of Mother's parental rights is in the best interests of the children.

As for the first statutory factor, several witnesses testified that Mother "has made such an adjustment of circumstance, conduct, or conditions as to make it safe" and in the children's best interests to be in her home. Tenn. Code Ann. § 36-1-113(i)(1). Ms. Dyer explained that Mother has obtained and held a job for more than two years, has obtained stable and safe housing, has established a strong family support system to assist her and the children, and has cooperated with DCS and complied with her permanency plan "three times over." Mother testified that her life has changed and now revolves around her children. Ms. Gebelein, the parent educator from Family Menders, described the parenting skills and topics she and Mother covered for two years and expressed her belief that Mother has satisfied all the requirements and has no further need of in-home services. Dr. Greaves viewed Mother as successfully completing all her responsibilities and being in remission from drug abuse. It is true that Dr. Greaves recommended

monitoring and supervision for two years after the children were back with Mother. But, by the time of trial, the children had been back with Mother for two years, and DCS had monitored the family during this time.

Several witnesses also offered testimony bearing on the second factor, which inquires whether Mother has effected "a lasting adjustment after reasonable efforts by available social services agencies." Id. § 36-1-113(i)(2). Again Ms. Dyer described Mother's changes as lasting, explaining that Mother's compliance with all of the DCS requirements had persisted for almost three years by the time of trial and that Mother had not wavered despite facing criminal charges, Juvenile Court proceedings, and Foster Parents' petition to terminate her parental rights. Mother testified that she had remained drug free and separated from Father for longer than she ever had previously, had filed for divorce, and was confident she would maintain the same stable lifestyle in the future. Ms. Gebelein testified that Mother had effected a lasting change and no longer needed in-home parental education services. Ms. Benson, Mother's probation officer, testified that Mother had completed six months of supervised probation and random drug screens successfully and had also successfully completed six months of unsupervised probation. Dr. Greaves testified that Mother had achieved success in the alcohol and drug treatment process and has the ability to stay away from Father.

As for the third statutory factor—"whether the parent . . . has maintained regular visitation or other contact" with the children, id. § 36-1-113(i)(3), the proof unquestionably favored Mother. By the time of trial, the children had lived with Mother for almost two years without incident. Additionally, Mother had visited the children regularly before they began residing with her.

As for the fourth factor, substantial proof was offered to establish that Mother and the children have a "meaningful relationship." Id. § 36-1-113(i)(4). Ms. Dyer testified that Mother plays with and cares for the children appropriately and that the children are very attached to Mother. Dr. Ozbek, who performed the bonding study only six months before trial, testified that the children are bonded to Mother, that they are a family unit, and that Gabriella and Jude want to live with Mother. Mother described her own attachment to the children, explaining that her children are her life. Although Foster Parents presented evidence suggesting that the children were upset and acted out when the frequency and duration of their visits with Mother initially increased, these incidents occurred more than two years before the trial in this matter. And other testimony, including that of Gabriella's and Jude's teachers, indicated that the children have thrived in Mother's care and are attached to her.

As for the fifth factor—"[t]he effect a change of caretakers and physical environment is likely to have on the child[ren]'s emotional, psychological and medical condition"—the proof indicated that removing the children from Mother would have a detrimental impact on them. Id. § 36-1-113(i)(5). Dr. Ozbek testified that removing the

- 24 -

children from Mother would be a loss for the children, particularly the two older children. She opined that terminating Mother's parental rights was not in the best interests of the children. Ms. Jaquith, an expert in social work, testified that removing the children from Mother would be extremely traumatic for the children. Ms. Dyer also testified that the children are attached to and should remain with Mother.

As for the sixth statutory factor, "[w]hether the parent, or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household," id. § 36-1-113(i)(6), the Court of Appeals appropriately considered Mother's conduct prior to July 2012. Mother's conduct had resulted in a Georgia court terminating her parental rights to her two oldest children in 2007. One of these children had been born addicted to drugs, and Mother had driven, while intoxicated, with the other child in the car, and was involved in a car accident that required Mother, Father, and the child to be transported to a hospital. As the Court of Appeals pointed out, Mother's poor parenting and drug abuse continued after Gabriella's birth and during her pregnancy with Jude. Jude was born addicted to drugs. Furthermore, Chance was born with drugs in his system because Mother received methadone to treat her drug addiction. Additionally, Chance was severely malnourished for six months while Mother was entirely responsible for his care. The conduct that resulted in Mother losing custody of these children and having her parental rights terminated to two other children by a Georgia court was, without question, reprehensible. By the time of this trial, however, more than three years had passed since Mother engaged in the reprehensible conduct that cost her the custody of these children. The proof shows that from at least July 2012 until the time of the trial, Mother had complied fully with the conditions DCS imposed for regaining custody of the children.

The seventh statutory factor inquires "[w]hether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child[ren] in a safe and stable manner." Id. § 36-1-113(i)(7). Ms. Dyer and Ms. Gebelin had both visited Mother's home on numerous occasions, and both testified that her home is healthy and safe. Neither observed any evidence of drug abuse. No proof was offered of any criminal activity in Mother's home. Although Mother failed to disclose her drug abuse history to medical providers and failed to request a non-narcotic pain medication, the proof showed that Mother had received only five short-term prescriptions for narcotic pain medications, had used the drugs as prescribed, and had notified DCS of the prescriptions. Both Dr. Greaves and Dr. Ozbek stated that using short term pain medications as prescribed is not a relapse to drug abuse, although both also expressed concern about Mother's failure to disclose her history of drug abuse to medical providers or to request non-narcotic pain medication. No proof was offered to establish that Mother had relapsed to drug abuse. All the proof indicated that Mother had not failed a

drug screen since June 2012, more than three years prior to the trial, even though she had been drug tested on many occasions both by Family Menders and by her probation officer.

The eighth statutory factor inquires "[w]hether the parent's or guardian's mental and/or emotional status would be detrimental to the child[ren] or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child[ren]." Id. § 36-1-113(i)(8). Dr. Greaves testified that Mother's anxiety and personality disorders and history of drug abuse do not prevent her from parenting the children. Dr. Greaves recommended that Mother seek counseling rather than psychiatric treatment to help her cope with anxiety because Dr. Greaves believed psychiatric treatment might pose a temptation for Mother to seek psychiatric drugs. Dr. Greaves opined that Mother's compliance with the permanency plan was commendable and that Mother was capable of caring for the children and staying away from Father. Gabriella's and Jude's teachers also testified that the children were performing well in Mother's care, always appeared clean and well fed, had few absences and ordinarily arrived on time for school, with Jude having received his ADHD medication before arriving at school. Gabriella had tested as gifted in first grade, an unusual distinction. Mother, Maternal Grandmother, and Uncle all had communicated frequently and appropriately with the teachers and satisfied parenting obligations.

The ninth and final statutory factor inquires "[w]hether the parent . . . has paid child support consistent with the child support guidelines . . . ." Id. § 36-1-113(i)(9). Because the children had lived with Mother for nearly two years, little time was devoted to this statutory factor. Mother testified that she had paid child support. Additionally, the 2012 permanency plan required Mother to pay child support as ordered, and the proof was undisputed that Mother had fully complied with that plan.

As the foregoing summary illustrates, almost all of the statutory factors, evaluated in the context of this case, weigh heavily against finding that terminating Mother's parental rights is in the best interests of the children. In reversing the trial court and holding that the proof amounts to clear and convincing evidence that termination is in the children's best interests, the Court of Appeals erroneously placed outcome-determinative weight on statutory factor six, and more specifically, on the proof regarding Mother's severe neglect of the children in the past. The Court of Appeals also placed great weight on Mother's history of drug abuse, which exacerbated the neglect, and the risk that, after she regains custody of the children and DCS is no longer involved, Mother will behave as she has in the past, return to Father, and resume abusing drugs. Foster Parents agree with the Court of Appeals and argue, as they have throughout these proceedings, that if Mother's parental rights are not terminated, she will follow the same pattern she has in the past after regaining custody of the children and ending DCS involvement and return to Father and drug abuse.

To be sure, the risk remains that Mother may abandon her many positive achievements—all too rare in parental termination proceedings—return to Father, and resume abusing drugs after DCS is no longer involved. Given the circumstances these children have already endured and the testimony indicating that they could again suffer substantial harm should Mother relapse, the Court of Appeals properly considered this risk when conducting the best interests analysis. Yet, the risk that Mother may relapse is a possibility only and does not amount to clear and convincing evidence that termination is in the best interests of these children.

Based on the proof in this record, Mother has achieved a rare accomplishment for parental termination proceedings. She has separated herself from a person who was long an abusive and toxic influence in her life. She has cooperated with DCS and completed all the tasks the permanency plan required of her. She has obtained treatment for a longstanding drug addiction and has remained drug free, as drug screens have demonstrated, for years after completing treatment. She has reestablished relationships with her children and built a strong family support system for herself and the children. The children have thrived in Mother's care and wish to remain with Mother. The expert witnesses and DCS witnesses opined that removing the children from Mother would not be in their best interests. The Juvenile Court opined that the children should remain with Mother. Considering the record as a whole, we conclude that the trial court correctly held that the combined weight of the proof does not amount to clear and convincing evidence that termination is in the best interests of the children.

By so holding, we do not at all condone or excuse the conduct that resulted in the removal of these children from Mother's custody. We also do not endorse every aspect of DCS's handling of this case. And we certainly do not minimize the genuine concern and affection Foster Parents have for these children. Our decision instead results from an objective and comprehensive review of the record to determine whether the facts presented satisfy the constitutionally mandated heightened standard of proof. This heightened standard is designed specifically to reduce the risk of erroneous decisions depriving parents of their precious and fundamental rights to the care and custody of children. In this case, this heightened standard of proof was not satisfied. We recognize that the result in this case is unusual, but this is an unusual case. Too often parents fail to rehabilitate themselves and make the changes needed to avoid losing their parental rights forever. The proof in this record establishes that Mother has been able to make the necessary adjustments. This is precisely how the system is designed to function. Should Mother revert to the reprehensible conduct that started the process that culminates with this decision, DCS will have the option of filing a termination petition, as the circuit court's finding of severe abuse has not been disturbed on appeal. Tenn. Code Ann. § 36-1-113(g)(4).

## IV. Conclusion

The judgment of the Court of Appeals terminating Mother's parental rights is reversed. The judgment of the trial court dismissing Foster Parents' petition is reinstated. Costs of this appeal are taxed to Foster Parents, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE