IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 2, 2023

IN RE ORIANA Y.

**Appeal from the Chancery Court for Washington County**
**No. 21-AD-0384    John C. Rambo, Chancellor**

_____

**No. E2023-00397-COA-R3-PT**
_____

A father appeals the termination of his parental rights to his child. The trial court terminated parental rights on the grounds of abandonment by wanton disregard and failure to manifest an ability and willingness to assume custody or financial responsibility for the child. The court also determined that termination was in the child's best interest. We agree and affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II and KENNY W. ARMSTRONG, JJ., joined.

Meghan A. Bodie, Knoxville, Tennessee, for the appellant, Billy Y.

Jason A. Creech, Johnson City, Tennessee, for the appellees, Joseph M. and Sherry M.

Kristi N. Johnson, Elizabethton, Tennessee, Guardian ad Litem.

**OPINION**

**I.**

**A.**

Billy Y. ("Father") and Stacy Y. ("Mother") are the biological parents of Oriana, a daughter born in 2018. Mother also had custody of another child from a previous relationship. In late 2020, Father and Mother separated. Mother moved to Georgia, leaving

Oriana in Father's care. She left the older child with Joseph M. and Sherry M. ("Guardians"), a couple that often cared for the children on the weekends.

Four months later, a warrant was issued for Father's arrest on a probation violation. He arranged for a neighbor to deliver Oriana to a police station. Alerted by Mother, the Guardians offered to take care of Oriana. On February 4, 2021, with Father's consent, the Tennessee Department of Children's Services entered an immediate protection agreement naming the Guardians as caregivers for both children.

The Guardians then filed a dependency and neglect petition in juvenile court. The court issued an ex parte protective order that same day. The order granted the Guardians temporary custody of both children. It also specified that Father was entitled to supervised visitation with his child upon request to the Guardians.

A week later, Father was arrested. He pleaded guilty to violating his probation and spent the next seven months in a federal prison. On July 8, 2021, while Father was incarcerated, the Guardians filed a petition to terminate Mother's and Father's parental rights to Oriana and to adopt.

During his incarceration, Father maintained contact with his child by phone. After his release in late September of 2021, Father contacted the Guardians about visiting his child. By then, she was almost three and a half years old. The Guardians told him to contact his lawyer.

On November 27, 2021, Father had his first visit with his child since his arrest nine months earlier. He ended the visit after 35 minutes. And he did not request another visit until the end of December. He continued to visit the child sporadically throughout the next year. The frequency of the visits varied widely. Some months, Father visited his child as many as three times. Other months he did not visit at all. The length of the visits ranged from four minutes on June 18 to two hours on July 23. But most visits were less than an hour. All told, Father spent approximately 15 hours with his child between his release date—September 24, 2021—and the first day of trial—November 29, 2022.

B.

Trial focused on the termination of Father's parental rights. Mother's parental rights were terminated earlier.

Oriana was four and a half years old at the time of trial. She had been living with the Guardians for almost two years. Before that, she had spent many weekends in their home with her half-sister. She had bonded with the Guardians, calling them "mom" and "dad." She was also extremely close to her half-sister, whom the Guardians had adopted.

2

When they first obtained custody in February 2021, the Guardians described the child as "pretty much nonverbal." She was behind on her vaccines. And she was small for her age, only in the third percentile for body weight. She also had some developmental delays. In the last two years, her condition had improved considerably. She had turned into a "chatterbox." With regular meals, she was gaining weight. And they had enrolled her in both occupational therapy and counseling.

The Guardians explained that they were unsure how to proceed when Father first contacted them about visiting his child. Ultimately, they chose to meet on Saturday mornings at a local restaurant. But they did not direct the frequency or the length of the visits. They could only recall one instance when they were unavailable on a requested date. At times, Father went weeks without requesting a visit. And he often ended the visits early.

According to the Guardians, Father did not try to cultivate a positive relationship with his child during the visits. He did not seem to understand how to interact appropriately with a small child. In their view, he brought gifts to the visits in an effort to trade "toys for affection." He spoke harshly to the child, chastising her if she was slow to interact with him or failed to appreciate his gifts. He often called her "mean." And he regularly threatened to take his gifts back if she was uncooperative. At one visit, he referred to her as "his property." They maintained that the child was troubled by his behavior. She began to experience "night terrors" after the visits started. And she often asked the Guardians if they thought that she was "mean."

The Guardians also submitted proof of Father's criminal history and illegal drug use. In 2014, he was convicted of six counts of cocaine distribution and one count of conspiracy to possess and distribute cocaine. He was sentenced to 70 months in a federal prison. He was released in May 2016 on supervision. He completed a mandatory residential drug treatment program while incarcerated. But he did not maintain his sobriety after his release.

Father learned Mother was pregnant with his child in August 2017. Yet he chose to smoke marijuana, a violation of his supervised release. His release was revoked that November, resulting in a six-month incarceration. He was released again two days before his daughter's birth in May 2018. Although he was referred to an area provider for substance abuse and mental health services, he did not contact the provider.

Just four months later, Father tested positive for marijuana and cocaine. He initially denied using either substance, but he later admitted his marijuana use. On further analysis, the marijuana finding was confirmed. The laboratory also determined that the specimen had been diluted, suggesting an attempt to falsify the result.

Father continued to fail drug screens for the next several months. He also lied to his probation officer and submitted diluted specimens. He was arrested shortly after his

child's first birthday. He pleaded guilty to violating five conditions of his supervised release. And he was sentenced to another nine months in prison.

Father returned home in March 2020 again on supervised release. By then, Father's relationship with Mother had soured. After the couple separated in September, Father became his daughter's primary caregiver. But he continued to use illegal drugs. His drug screen on September 28, 2020, was positive for marijuana. A couple of months later, his probation officer lost contact with him. And Father failed to appear for his next mandatory drug screen. Another arrest warrant was issued.

Father knew his arrest was imminent. So he asked a neighbor to drop his child at a police station. He claimed that he had no other options. He was arrested on February 23. This time, he consented to the revocation of his supervised release. He spent the next seven months in prison.

At trial, Father claimed that he had changed his lifestyle. In his words, "I'm in the best position I ever been in my life to take care of a kid by myself." Since his release, he had rented a three-bedroom duplex. He had a steady income, around $4,000 a month, and few expenses. But he still smoked marijuana on a daily basis. He estimated that he spent about two or three hundred dollars a month to support his habit. He claimed that he would never smoke marijuana around his child. And, if necessary, he could kick the habit in about six months.

Father told the court how much he loved his child. He believed they had a "special bond." He blamed the Guardians for his inconsistent visitation record. He claimed that they thwarted his initial attempts to visit. And he complained that the visit location was not conducive to reconnecting with his daughter. His visits were short because the Guardians made him so uncomfortable. But he also admitted that he forewent opportunities to spend time with his child because he had other priorities at the time.

According to Father, the Guardians rebuffed his offers to help support his child. Still, he maintained that he sent $500 to them two or three times after his release.[1] No one ever told him to do more.

On November 16, 2022, mere days before trial, Father tested positive for fentanyl, high levels of cocaine, and THC, a marijuana metabolite.[2] He denied using any illegal drugs other than marijuana. Father insisted that he had not used cocaine since the end of the previous year. He suggested that his marijuana may have been tainted or that he

---

[1] The Guardians claimed that they only received one $500 payment from Father.

[2] Father also tested positive for marijuana during the month between the two days of trial.

4

somehow ingested cocaine and fentanyl through contact with other drug users. As he put it, he was living "like a single bachelor . . . running around doing ungodly acts with-- women that may be on--on drugs." He had been "partying . . . hard" because he "didn't have no responsibilities" and he "was dealing with a lot of stress."

Father admitted that he had been diagnosed with anxiety and PTSD. He never sought treatment because mental illness was viewed as a weakness in his community. Instead, he tried to "just deal with life as it comes." And his main coping mechanism when under stress was marijuana.

Despite his long history of illegal drug use, Father denied ever using illegal drugs in his child's presence. But another witness provided conflicting testimony. That witness told the court that Father smoked marijuana while sitting near his daughter. She had also seen Father snort a white powder off furniture in the family's apartment. The same witness claimed that the child had been present during some of Father's drug transactions.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody their child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (2021).

Tennessee Code Annotated § 36-1-113 describes both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one statutory ground for termination. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c)(1). If they prove the existence of one or more statutory grounds, they then must prove that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c)); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d at 546. This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn.

1992). It produces a firm belief in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

1. Abandonment by Wanton Disregard

The court found Father had abandoned his child under a definition of "abandonment" applicable to parents who were incarcerated when the petition to terminate was filed or at any point during the four-month period preceding the filing of the petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2021). When this petition was filed, the incarcerated or formerly incarcerated parent was deemed to have abandoned his child if, among other things, he had "engaged in conduct prior to incarceration that exhibit[ed] a wanton disregard for the welfare of the child." *Id.* § 36-1-102(1)(A)(iv)(c).

"Wanton disregard" is not a defined term. Acts amounting to wanton disregard typically "reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). So "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). Ultimately, the question is "whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* at 866.

Here, the record establishes such a pattern of conduct. Father had multiple probation violations after he learned that Mother was pregnant with his child. *See In re Anthony R.*, 2015 WL 3611244, at *3 (reasoning that the actions constituting wanton disregard must have occurred at a point in time when the parent had knowledge of the child's existence, which can include "a child *in utero*"). He used illegal drugs. He tried to falsify his drug screens. He lied to his probation officer. As a result, his release was revoked three times. When not incarcerated, Father failed to act in his child's interest. He never sought mental

6

health treatment. And he never stopped his illegal drug use. Father contends that he never used illegal drugs in the presence of his child. But the court credited another witness's testimony to the contrary. We find no basis in this record to disturb that credibility assessment. *See Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct. App. 2009).

2. Failure to Manifest an Ability and Willingness to Assume Custody

The court also found termination of Father's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he

> [1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

*Id.* § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). As to the first prong, the petitioner may prove that a parent is either unable or unwilling to "assume legal and physical custody or financial responsibility for the child." *Id.* at 677.

The trial court found that Father failed to manifest a willingness to assume custody or financial responsibility for his child. We agree. At trial, Father shared his love for his child and his desire to be a part of her life. But desire alone is insufficient. In the court's view, Father's conduct did not reflect a true willingness to care for his child. He never stopped using illegal drugs. And he spent more on his marijuana habit than his child. Father also lacked the ability to provide a safe and secure environment for his child. "[A] suitable home must be free from drugs." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016).

The evidence is equally clear and convincing that placing the child in Father's custody would pose a risk of substantial harm to her psychological welfare. Father argues that the Guardians failed to establish the element of substantial harm. To the contrary, Father's admitted marijuana use as well as his recent positive drug test showing high levels of cocaine and the presence of fentanyl indicate a sufficiently probable danger to this child if she were placed in his custody. *See In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) (recognizing that "parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm").

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Tennessee Code Annotated § 36-1-113(i) lists twenty factors for courts to consider in a best interests analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. The analysis should consider "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[ ] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016).

The court found that the Guardians provided the child with the only stability she had ever known. Father had exposed her to illegal drugs and his criminal associates. He failed to ensure that she received adequate nutrition and medical care. And he was repeatedly incarcerated, leaving him unable to parent. Tenn. Code Ann. § 36-1-113(i)(1)(C), (N), (O), (P). Unlike Father, the Guardians consistently met her medical, nutritional, and emotional needs. *Id.* § 36-1-113(i)(1)(A). The child viewed the Guardians as her parents. *Id.* § 36-1-113(i)(1)(H). And she had a strong bond with her half-sister, whom the Guardians adopted. *Id.* § 36-1-113(i)(1)(I). A change in caregivers would be emotionally harmful for the child. *Id.* § 36-1-113(i)(1)(B).

In the court's view, Father had not made a lasting adjustment. *Id.* § 36-1-113(i)(1)(J). A roof over his head and a steady income did not ensure that Father could properly care for the child. He continued to use illegal drugs, risking further incarceration. His persistent drug use also impaired his ability to parent. *Id.* § 36-1-113(i)(1)(Q), (R). And his failure to address his illegal drug use in any meaningful way showed a lack of urgency on his part. *Id.* § 36-1-113(i)(1)(M).

The court also found that Father did not have a secure and healthy parental relationship with the child. He was "more attached to illegal drugs than his own child." He let other priorities take precedence over visiting his child. His interactions during his periodic visits "demonstrate[d] a lack of parental instinct." The quality of the visits was poor, and "this was due to Father's approach to visits." He accused the child of being mean

8

when she did not naturally respond to him.  He did not use his time with his child to cultivate a positive relationship.  *Id.* § 36-1-113(i)(1)(D), (E).

Contrary to Father's arguments on appeal, the evidence does not preponderate against these findings.  The combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interest.  Father has not made a lasting adjustment in his life.  His illegal drug use persists.  He does not have a meaningful relationship with his child.  He has not demonstrated a desire to have a healthy parent-child relationship.  The child is thriving in her current environment.  The Guardians give the child the earliest possible chance at permanency.

### III.

We affirm the termination of Father's parental rights.  The record contains clear and convincing evidence to support more than one statutory ground for termination.  We also conclude that terminating Father's parental rights is in the child's best interest.

_s/ W. Neal McBrayer_
W. NEAL MCBRAYER, JUDGE