IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 1, 2024

FILED

AUG 30 2024

Clerk of the Appellate Courts
REc'd By _____

**IN RE MIA C.**

**Appeal from the Circuit Court for Hamilton County**
**No. 22A177  Mike Dumitru, Judge**

_____

**No. E2023-00828-COA-R3-PT**

_____

JEFFREY USMAN, J., concurring.

I wholly concur with Judge Frierson's well-reasoned conclusion that our de novo review of the underlying record in this case demonstrates that Mother and Stepfather have presented clear and convincing evidence that termination of Father's parental rights is in Mia's best interest. I write separately to address the important concerns raised by Judge Stafford in his thoughtful dissent.

In assessing whether termination is in Mia's best interest, it is of critical significance that this dispute over termination arises out of what was "a terribly abusive relationship." The Bradley County court found that Father had been "repeatedly and physically abusive to the Petitioner/Mother and that the Father has been physically and repeatedly abusive to the parties' minor daughter." It found Father's testimony not credible and described him as a "volatile" person who "takes no responsibility for his actions."

The Hamilton County trial court agreed that Father was "repeatedly and physically abusive" to Mother, "as evidenced by the documents and testimony introduced by into evidence." Like the Bradley County court, the trial court made a credibility finding against Father on the abuse issue and noted Father took no responsibility and "implausibl[y]" denied knowing about Mother's injuries. The court credited the evidence corroborating abuse, including the audio recording and the threatening text messages and messages through social media, as well as the testimony of Mother's family members.

In addition to physical abuse, Father also repeatedly threatened Mother. With Mia present, Father asked Mother if she wanted him to "[p]ut a bullet in [her] fucking brain." Father added that "It won't really stay there. It will go right through." Among other threatening messages Father wrote to Mother, he stated the following:

Stupid cunt, you're retarded
I hate you
If you ever fight for
custody I will bury you in
the ground. I should've
shot you a long time ago
before I got you pregnant.
Mia will never know you.
Don't try to come for your
stuff it'll be taken care of
and burned for you.

Another time, Father threatened to kidnap Mia:

I can take Mia where
no one would ever find us.
Don't push me. You'll be a
childless miserable woman
who should have respected me.

On another occasion, Father wrote:

You have made me be this person
towards my kids and made me
hate you. I wish your heart
condition would kill you
already. You're such a fucking
bitch.

Father also wrote:

The cops? Again? If you think
for a second I'm going to let
you get away with keeping my
kid from me you've got another
thing coming. I will kill you. You
want to throw me in jail? It will
be worth it.

In addition to his threats to murder Mother and to kidnap Mia, Father repeatedly physically abused Mother. Father persisted in his abuse even during Mother's pregnancy and while she was engaged in nursing Mia a week after giving birth. During her pregnancy, Father's abuse caused Mother to suffer internal bleeding. While Mother was nursing their

one-week-old child, Father hit Mother so hard that he rendered her unconscious, causing her to fall to the floor with Mia. Father also threatened Mother with a gun on multiple occasions in the presence of the child and choked her in the presence of the child. Mother introduced proof of various injuries, including multiple bruises, an injured lip, a knot on her head, and marks around her neck, and she testified that Mia was present during the infliction of these injuries. Mia's maternal grandfather testified that he confronted Father about the injuries he was inflicting on Mother and that Father stated that the maternal grandmother "should have raised [Mother] better to obey a man." Mother testified that Father never expressed regret about the acts of abuse and told her that she "should learn how to be a woman and keep [her] mouth shut."

The trial court also found that Father had struck Mia in the mouth, bitten Mia's finger, and pulled Mia's hair.[1] Father's trial testimony on striking Mia was self-contradictory: he initially denied ever "popping" Mia in the mouth but later admitted that he did so to "g[e]t her attention." However, he admitted in a text message he hit the fifteen-month-old child: "I didn't hit her that hard. That was a light pop on the mouth it was not as bad as you're going to make it out to be. She should not scream at me that way she is acting like a brat like her mom." He also admitted biting Mia in a message: "I didn't abuse her, I just punished her by biting her back."

Father never expressed contrition for these acts, because he did not acknowledge they were abusive. Throughout the entirety of the trial, Father denied that he abused Mother or Mia and instead offered an alternative narrative that he was the victim of abuse. Ms. Chase, Stepmother, Father's father, and Mother's father all testified that Father had told them that his role in the physical confrontations was self-defense and that he was not abusive to Mother. Father also told his family members and friends that the abuse allegations made by Mother were false and that he was accused of injuring Mia but had not done so. Father maintained this position at trial, testifying that he was the victim and that the allegations of abuse were fabrications. Mother's version of the abusive relationship was supported by numerous photographs, the threatening and self-incriminating messages sent by Father, the audio recording of Father threatening to kill Mother, Mother's family's testimony regarding her bruises and injuries, and DCS and police reports observing marks on Mother. Regarding the issue of abuse, the trial court credited Mother's testimony in this regard; the trial court found Father not credible.

In addition to this Father's acts of abuse, the standard of review is likewise important to the outcome of this case. This court's review regarding whether there is clear and convincing evidence to support the conclusion that termination is in the best interest of the child is de novo with no deference granted to the trial court's conclusion. *In re Neveah M.,*

---

[1] Mother also testified that Father spanked Mia multiple times before the age of one and in one case left bruising. The court made no findings regarding this testimony.

614 S.W.3d 659, 674 (Tenn. 2020); *In re Tamera W.*, 515 S.W.3d 860, 870 (Tenn. Ct. App. 2016); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639-40 (Tenn. 2013). In this case, both the majority opinion and the dissent agree that grounds for termination were established and that the result of the termination proceeding turns on the best interests analysis.

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Ascertaining the child's best interests is "a fact-intensive inquiry" and requires courts to weigh the evidence regarding the applicable factors. *Id.* at 878. Facts considered in analyzing the child's best interest must be proven by a preponderance of the evidence rather than clear and convincing evidence. *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). This court reviews the trial court's factual findings related to best interests de novo with a presumption of correctness unless the evidence preponderates otherwise. *In re Neveah M.*, 614 S.W.3d at 674. The court then considers the combined weight of those facts to determine if there is clear and convincing evidence that termination is in the child's best interests. *In re Gabriella D.*, 531 S.W.3d at 681 (quoting *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015)). This is not a rote examination of the statutory factors or a tallying of the number of factors weighing in favor of or against termination. *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 878. "A court must consider all the statutory factors but may appropriately ascribe more weight—even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors." *In re Neveah M.*, 614 S.W.3d at 679. Appellate analysis of the best interest factors frequently includes a reevaluation of the weight of a particular factor. *See, e.g., id.* at 680 (affirming the trial court's reliance on three of the factors and noting that a fourth factor should also be considered as weighing in favor of termination); *In re Gabriella D.*, 531 S.W.3d at 683-84; *In re Silvia F.*, No. E2023-00704-COA-R3-PT, 2024 WL 3496302, at *17 (Tenn. Ct. App. July 22, 2024) (noting trial court gave too limited of consideration to the factor concerning a parent's understanding of the child's needs); *In re Amayzha L.*, No. M2023-00044-COA-R3-PT, 2023 WL 6122058, at *13 (Tenn. Ct. App. Sept. 19, 2023) ("We therefore conclude that the Juvenile Court incorrectly weighed this factor in favor of termination" based on a factual finding not supported by a preponderance of the evidence); *In re Erin N.*, No. E2021-00516-COA-R3-PT, 2022 WL 444284, at *27 (Tenn. Ct. App. Feb. 14, 2022) ("Based on the lack of evidence concerning Father's mental or emotional status, we determine that the court erred by weighing the factor neutrally instead of against termination.").

The dissent takes issue in part with what it perceives as a rejection of the trial court's factual finding that Mother was not credible regarding the facilitation of visitation. The dissent argues that there is no "clear and convincing evidence in the record to support overturning the trial court's credibility determination as to Mother's intentional interference with Father's ability to enjoy visitation or form a healthy attachment with the

- 4 -

Child." I agree that we are bound by the trial court's credibility-based determination that Mother refused to facilitate visitation. I do not, however, see this credibility determination as pivotal in the ultimate conclusion that clear and convincing evidence shows that it is in the Child's best interest that Father's rights be terminated. Furthermore, I disagree with the dissent that this credibility determination alters the ultimate outcome as to factor (D). *See* Tenn. Code Ann. § 36-1-113(i)(1)(D) ("Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment").

The trial court found that factor (D), regarding a child's attachment to the parent, was applicable and that Mia had no current attachment to Father. However, the trial court concluded this factor weighed against termination because Mother had interfered with visitation and because there was a reasonable expectation that Father could create a bond. Accepting the trial court's finding that Mother interfered with visitation, the majority opinion nevertheless concludes that this factor weighs in favor of termination because Father admitted to hitting Mia in the mouth, admitted to biting Mia's finger, and admitted to pulling Mia's hair and because of his continued refusal to recognize that his method of "discipline" was abusive. Father not only hit Mia in the mouth and bit Mia, drawing blood both times, but he also inflicted abuse on Mother in Mia's presence numerous times. Mother's testimony, which the trial court credited on this issue, was that Father threatened her with a gun in Mia's presence and knocked her unconscious while she was holding and nursing their one-week-old child. Furthermore, Father maintained, even at the time of trial, that his actions toward Mia had been appropriate, and he denied any abuse of Mother, suggesting she had fabricated the text messages and inflicted bruising on her own throat. Father made concerning statements, calling the fifteen-month-old child a "brat" in a text message justifying his abusive behavior and telling his son, after hitting Mother, "That's what happens when you talk back to Dad." Father also threatened to kidnap Mia and keep her from Mother. The trial court credited this proof, relying on the audio recordings, messages, and Mother's testimony in finding that Father committed abuse. Father's abusive past behavior toward Mia and his continued denial of wrongdoing lead to the conclusion that there is not a reasonable expectation that Father and Mia will be able to form a healthy relationship. Such a conclusion does not, as the dissent suggests, require us to condone Mother's interference with visitation. Fully accepting the trial court's conclusion that Mother interfered with visitation, this does not lift the pressing weight of Father's abusive behavior to Mother and to Mia, behavior which he has not regretted or disavowed. Father's abusive conduct and his view of that abuse lead to the conclusion that there is no prospect that Father will be able to develop a healthy relationship with Mia. This factor should weigh heavily in favor of termination.

Regarding factor (E), which concerns visitation, on this matter, I do agree with the dissent that the trial court's finding that Mother interfered with visitation impacts the

analysis of this factor.[2] *See* Tenn. Code Ann. § 36-1-113(i)(1)(E) ("Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child"). The court initially ordered supervised visitation in September 2020, and Father timely completed the intake and the psychological evaluation with Dr. Biller. According to Father's filings and the guardian ad litem's post-trial statement, Father waited until February 2022 to file a motion to enforce visitation. Father had no contact with Mia for sixteen months after the initial order regarding visitation. While I agree with Judge Frierson that the aforementioned response does not demonstrate urgency in these visits, Father presented testimony that he repeatedly contacted Solomon Services during this time. Ms. Chase confirmed that Solomon's efforts to contact Mother were most probably prompted by the visiting parent's inquiries. The trial court noted that Father attended every visit from April 8, 2022, to June 24, 2022, and that Mother failed to bring the child to many of these visits. Accordingly, while Father may have failed to demonstrate real urgency in addressing Mother's uncooperative actions, the trial court's findings suggest it was primarily Mother's actions that delayed the court-ordered visitation. This factor, accordingly, does not weigh in favor of termination.

The dissent also argues that the factors weighing against termination are improperly given short shrift. The majority opinion agreed with the trial court that factors (F) and (G) weigh against termination. *See* Tenn. Code Ann. § 36-1-113(i)(1)(F) ("Whether the child is fearful of living in the parent's home"); Tenn. Code Ann. § 36-1-113(i)(1)(G) ("Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms"). The amount of weight placed upon these factors in Judge Frierson's opinion is in my view entirely appropriate. I would accord factors (F) and (G) only the slightest modicum of weight. Father's last unsupervised contact with Mia was before she was 16 months of age. Dr. Biller testified as to a child's memory deficiencies at that age. While the evidence showed that Mia appeared to have no residual trauma from Father's past abuse, Father secured this advantage by inflicting abuse on a child and her Mother when the child was so young that she could not be expected to retain coherent memories of the events. That Father's abuse of Mother and Mia occurred at such a young age, before the child's memory had further developed, does not inure greatly to Father's favor.

The dissent argues that Father has changed his behavior and that this affects the weight of the remaining factors that the majority opinion concludes weigh against termination. *See* Tenn. Code Ann. § 36-1-113(i)(1)(O) ("Whether the parent has ever provided safe and stable care for the child or any other child"); Tenn. Code Ann. § 36-1-113(i)(1)(P) ("Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive"); Tenn. Code Ann. § 36-1-113(i)(1)(Q) ("Whether the parent has demonstrated the ability and commitment to creating and

---

[2] In all other respects, I concur in the majority's analysis of the various factors relevant to the best interest analysis.

maintaining a home that meets the child's basic and specific needs and in which the child can thrive"); Tenn. Code Ann. § 36-1-113(i)(1)(R) ("Whether the physical environment of the parent's home is healthy and safe for the child"). The dissent concludes that "there is nothing in the record, other than the assumption that Father's past behavior will continue, to indicate that Father currently poses any threat to the Child." I respectfully disagree with this conclusion.

The dissent relies in part on a determination that Father, while not accepting responsibility for his prior behavior, made positive changes in his life. These changes, it appears, consist of Father having a positive relationship with his son, Stepmother, and Stepmother's children[3] and of Father not perpetrating abuse on Mia during supervised visitation. The dissent states, "By all accounts, Father maintains a strong bond with his son and is a positive presence for all of the children in his life." I cannot agree that Father is by all accounts a positive presence for all of his children in his life. Mother recalled that Elliott was present when Father abused her with Father stating to Elliott, "That's what happens when you talk back to Dad." She also stated that Elliott was left in the house of Mother's friend, who was a stranger to Elliott, during an argument which culminated in Father pushing Mother by the throat against a car window. The trial court credited Mother's testimony regarding the incidents of abuse. This is not a father who is "a positive presence for all of the children in his life."

Furthermore, while Father took the minimal step of refraining from abuse while Solomon Family Solutions staff were watching, there is simply nothing in the record to show that Father has changed his behavior to Mia or her Mother. Up to and during trial, in the face of overwhelming physical evidence and contrary to certain admissions he had made, Father continued to claim that he was the victim of abuse and that Mother had fabricated evidence that he had physically injured her and Mia. Father apparently successfully and unremorsefully conveyed these falsehoods to both Ms. Chase and Dr. Biller. The trial court credited Mother that Father was abusive to both her and Mia. Furthermore, as the majority opinion notes, this court has previously stated that refusal to accept responsibility reflects on willingness to change. In *In re Porcalyn N.*, this court concluded that the father's refusal to accept responsibility for domestic abuse and the father's asserting that mother was the aggressor weighed in favor of termination under the factors considering whether the parent had made adjustments of his circumstances and whether the parent's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision. No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *12 (Tenn. Ct. App. May 21, 2021); *see also In re Brandon H.*, No. E2020-00713-COA-R3-PT, 2021 WL 321383, at *7 (Tenn. Ct. App. Feb. 1, 2021) (concluding that a refusal to acknowledge past abuse reflects on willingness to change harmful behaviors because "[t]o create a home that

---

[3] This court denied Mother's motion to consider the post-judgment fact that Father and Stepmother are in the process of divorcing.

was safe and suitable for the Child, Father had to first admit that he abused the Child"); *In re Aireona H.W.*, No. E2014-00241-COA-R3-PT, 2014 WL 4102121, at *8 (Tenn. Ct. App. Aug. 20, 2014) (Mother's "inability to accept responsibility for her actions place[s] doubt upon her ability to effectively parent the Child in the near future"). Accordingly, to the extent that factors (O), (P), (Q), and (R) weigh against termination, they do not bear great weight in the face of Father's continued refusal to acknowledge or attempt to rectify his violent outbursts toward Mother and Mia.

The dissent also takes issue with the analysis of factor (T), related to the treatment of Dr. Biller's testimony, arguing that the majority is substituting its judgment for that of the trial court in failing to give weight to Dr. Biller's testimony. *See* Tenn. Code Ann. § 36-1-113(i)(1)(T) ("Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child"). Dr. Biller conducted the initial evaluation as a forensic evaluation and concluded that Father posed no risk of harm and should be permitted to have unsupervised visitation. Dr. Biller based his initial conclusions on false facts relayed and true facts omitted[4] by Father, including: (1) Father told Dr. Biller he did not abuse Mother or Mia; (2) Father told Dr. Biller he was the victim of abuse; (3) Father omitted that he had been charged with multiple counts of domestic assault; (4) Father omitted that he had pled guilty to domestic assault; (5) Father omitted his admission that he had bitten Mia; (6) Father omitted his admission that he "popped" Mia in the mouth; (7) Father omitted his admission that he pulled Mia's hair; (8) Father omitted evidence of Mia bleeding from injuries and evidence of Mother's bruises; (9) Father omitted the audio recordings and his admission that it was his voice telling Mother that if he went to jail, "I'm going to do something to deserve it;" (10) Father omitted his repeated threats to murder Mother and his threat to kidnap Mia.

The trial court noted that several witnesses testified for Father regarding his mental and emotional fitness but that none of these witnesses were able to observe Father regularly during the relevant period. However, the court went on to note it placed "greater emphasis" on Dr. Biller's opinion. The court observed that Dr. Biller, whose evaluation was dependent upon Father's rendition of events, initially had no concerns regarding Father and concluded that a relationship between Father and Mia "would not be harmful." The court found that, confronted with the evidence of abuse, "Dr. Biller testified that he may have approached the evaluation differently, but that his opinion would not change."

This is true, but incomplete. Dr. Biller did testify that the numerical test results obtained by Father and the resultant opinion he gave in his psychological evaluation would not change based on simply viewing the evidence. However, both at trial and in his deposition, which was introduced at trial, Dr. Biller stated that *if the allegations that had been presented were true*, which the trial court found they were, his recommendation

_____

[4] We describe these facts as true and false based on the trial court's findings regarding abuse.

regarding visitation would actually change. Furthermore, asked at trial if his opinions would change if the proof demonstrated that Father was, in fact, abusive of Mother and Mia, Dr. Biller responded, "Yes. If that comes out, that the objective findings of fact do indeed substantiate the allegations, then that would change my testimony." He agreed that if the proof showed abuse, it could cause him to have reservations about Mia being exposed to Father. Dr. Biller testified at trial that the disclosure of abuse could have affected his ultimate reasoning and that a patient's lack of transparency would be relevant to the test results. Regarding his visitation recommendation, Dr. Biller elaborated that if a child were able to work through prior abuse in a safe environment, the relationship with an abusive parent could be repaired. However, he also suggested that the opposite might also be true:

> On the other hand, if there is a trial of this therapeutic supervised visitation, if that isn't — if that doesn't work and it's clear that the damage was so irreparable that it would do more harm to continue — but if that hasn't happened, there has not been an interaction with a therapeutic situation where there was a child therapist who supervised the visitation with the father, I would recommend that that be done before any termination were suggested.

The trial court concluded its analysis of factor (T) by correctly observing that Dr. Biller "would still recommend supervised therapeutic visitation between Father and the Child before terminating Father's parental rights." Although this was Dr. Biller's recommendation, the entirety of Dr. Biller's testimony, to which the trial court gave weight, leads merely to the conclusion that Dr. Biller would revise his recommendations if the abuse were substantiated and would recommend attempting therapeutic visitation, which he acknowledged might not be successful, and anger management for Father. The proof at trial showed that the allegations of abuse were in fact substantiated.

Accordingly, we are left not with Dr. Biller's initial testimony but his alternative testimony that he would have reservations about Mia being exposed to Father, that there was a chance that the harm from abuse was irreparable, but that Dr. Biller would nevertheless recommend therapeutic supervised visitation. Throughout trial, Father continued to refuse to acknowledge that he had been abusive to either Mother or Mia. Dr. Biller testified that in the months before trial, Father had told him "there were extenuating circumstances that could be brought to light in court and he would be exonerated." Dr. Biller agreed that the magnitude of the falsehoods he was told would reflect on the magnitude of the revisions he would make to his opinion. Although Dr. Biller made a recommendation regarding visitation, he did not at trial give an ultimate opinion on Father's mental or emotional fitness or whether Father's mental state would prevent him from consistently and effectively providing safe and stable care and supervision if the facts were as alleged rather than as Father represented.[5] I conclude that, even giving weight to

---

[5] Father did not clarify the field in which he wished to tender Dr. Biller as an expert. Dr. Biller is a psychologist who examined Father. Dr. Biller explained that he was initially hired for a forensic report,

- 9 -

Dr. Biller's testimony, as the trial court did, the evidence as a whole suggests that this factor should weigh in favor of termination. Father's past abuse, and his continued refusal to acknowledge his abusive behavior, do not point to the ability to provide safe care, as Dr. Biller acknowledged when he said that, if the allegations were substantiated, he might have reservations about Mia being exposed to Father and would recommend only supervised visitation. A recommendation that the visitation be supervised indicates that Dr. Biller believed that perhaps, at some future time, Father might be able to consistently and effectively provide safe and stable care but that he could not do so now. Given the trial court's findings with regard to abuse and that Father continued to deny wrongdoing, it does not appear that Father would be able to consistently and effectively provide safe and stable care under factor (T).

I also disagree that the circumstances in *In re Archer R.*, No. M2019-01353-COA-R3-PT, 2020 WL 820973 (Tenn. Ct. App. Feb. 19, 2020), are "similar" to the circumstances of this case. As the dissent acknowledges, the father in *Archer R.* did not repeatedly threaten the mother's life, did not leave significant bruising on the mother on multiple occasions, did not knock the mother unconscious while the mother was nursing, causing her to fall with the baby, and did not on multiple occasions cause injuries to a child barely out of infancy in the name of "discipline."

While the dissent expresses entirely legitimate concerns regarding an appellate court overstepping its bounds in reviewing a trial court's factual findings and credibility determinations, I do not agree that such overstepping has occurred in this case. The divide with the trial court is not over the facts and credibility findings reached by the trial court, which are accepted, but instead as to how these factual findings intersect with the best interests factors, and even more so the relative weight of the various factors under the circumstances of the present case.

Judge Frierson's opinion defers to the trial court's credibility determinations — (1) that Father was abusive to Mother and to Mia and (2) that Mother subsequently interfered with the abusive Father's visitation. Under all of the facts and circumstances of this case as found by the trial court, I am in full agreement with Judge Frierson that clear and convincing evidence supports the conclusion that it is in Mia's best interest to terminate Father's parental rights.

In reaching this conclusion, it is important to note that the Tennessee Supreme Court has indicated that in evaluating the best interests of a child, "the facts and circumstances of

---

meaning that the court was his client and he was gathering information to allow the court to determine the best interests of the child. He noted that he was relying on Father's information "with the idea being that the Court would be able to be the trier of truth" if the information were incorrect. However, he subsequently conducted six "sessions" with Father as his client. It does not appear that Dr. Biller was presented as an expert in the best interest of the Child. In fact, Dr. Biller had never met the Child.

each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *See In re Gabriella D.*, 531 S.W.3d at 682. In the present case, Father engaged over the course of an extended period of time in repeated acts of extreme violence toward Mother. Testimony indicated that he made statements suggesting such violence as an appropriate manner of maintaining compliance by women. He repeatedly threatened to murder Mother, and he threatened to kidnap Mia. He also abused Mia. Father refused to acknowledge wrongdoing; he refused to attempt to remedy the harm. Instead of accepting that he had done grievous wrong, he attempted to shift the blame to Mother and Mia. Accepting that Mother failed to be cooperative in promoting visits with Father, these circumstances, nevertheless, demonstrate in a clear and convincing manner that it is not in Mia's best interest to preserve Father's parental rights.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE