IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2025

**IN RE JUANITA M.**

**Appeal from the Juvenile Court for Dyer County**
**No. 23-JV-249      Jason L. Hudson, Judge**

—————————————

**No. W2025-00822-COA-R3-PT**

—————————————

ANDY D. BENNETT, J., dissenting.

I concur with most of the majority's analysis of the grounds for termination of the parents' parental rights. However, I disagree with the finding of severe abuse by the father and I disagree that the best interests of the child require termination.

In December 2024, Mother pled guilty to child neglect under Tenn. Code Ann. § 39-15-401. Father's culpability for severe child abuse is unclear. He did use methamphetamine, but there is no evidence in the record that he used it around the child or "failed to protect the child from severe child abuse" by Mother. Father also claimed not to know that Mother was using methamphetamine. The trial court seemed to accept, without saying so, the department's argument that it is incredulous to think that the two parents, who had been in a relationship for 13 years, and who both favored the same drug, did not know of the other's drug use. Without more evidence in the record, however, I cannot find that there is clear and convincing evidence that Father either exposed the child to methamphetamine or knowingly failed to protect her from Mother's use of methamphetamine

The party petitioning for the termination of parental rights has the burden of demonstrating by clear and convincing evidence that termination is in the best interest of the child. *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010). Both parents maintain that the best interest factors do not favor termination of their parental rights. Both emphasize the alleged lack of reasonable efforts of the department in their analysis of the termination grounds and best interest.

I begin with an analysis of the department's reasonable efforts. Why do we require the department to make reasonable efforts to assist parents facing termination of their parental rights? We, as a society, value keeping families together. The interest of parents in the care, custody and control of their children is "perhaps the oldest of the fundamental

liberty interests protected by the [United States] Constitution." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). This fundamental liberty interest does not end just because the parents have lost temporary custody of their child. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). In Tennessee, DCS is the state agency charged with facilitating the preservation of family units and, when necessary, the separation of family units. Tenn. Code Ann. §§ 36-1-102(20); 37-1-102(b)(12) (definition of "department"). DCS was chosen because of the prominent role it plays with dependent and neglected children. *In re Tiffany B.*, 228 S.W.3d 148, 157-58 (Tenn. Ct. App. 2007), overruled on other grounds in *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn 2015). Thus, DCS is required to make reasonable efforts to "(1) prevent the need for removal of the child from such child's family; or (2) make it possible for the child to return home." Tenn. Code Ann. § 37-1-166(a). "[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent."[1] *In re Kaliyah S.*, 455 S.W.3d at 555. As our Supreme Court has pointed out, this does not minimize the importance of DCS's efforts:

> "In many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support. Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not."

*Id.* at 556 (quoting *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004), overruled on other grounds in *In re Kaliyah S.*, 455 S.W.3d at 555). "Reasonable efforts" are defined in Tenn. Code Ann. § 37-1-166(g)(1) as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family."[2] Diligence has not been defined in Tennessee in the context of reasonable efforts, but elsewhere it has been likened to "affirmative, repeated, and meaningful efforts to assist the parent in overcoming [the

---

[1] "Indeed, the only termination ground requiring proof of DCS's reasonable efforts is the ground for abandonment by failure to provide a suitable home." *In re Rome W.*, No. E2024-00621-COA-R3-PT, 2024 WL 4949057, at *8 n. 5 (Tenn. Ct. App. Dec 3, 2024).

[2] Reasonable efforts are not required if a court of competent jurisdiction has determined "the parent has subjected the child that is subject to the petition . . . to aggravated circumstances as defined in § 36-1-102" or "if the parental rights of the parent to a sibling or half-sibling have been terminated involuntarily." Tenn. Code. Ann. § 37-1-166(g)(4)(A), (C). Mother pled guilty to child neglect under Tenn. Code Ann. § 39-15-401. Child neglect is not an aggravating circumstance under Tenn. Code Ann. § 36-1-102. There is a passing reference to a prior child being "adopted out" due to the use of methamphetamine at trial. By then all the efforts by DCS had been made. The circumstances of Tenn. Code Ann. § 37-1-166(g)(4)(A), (C) have not been met.

obstacles]' to reunification." *In the Matter of K.Y.Z.*, --- N.E.3d ---, 2025 WL 2955728, at *10 (N.Y. Oct. 21, 2025).

The factor found in Tenn. Code Ann. § 36-1-113(i)(1)(L) most directly addresses DCS's efforts: "Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department." Mother maintains that there is no clear and convincing evidence of reasonable efforts provided by DCS as to drug rehabilitation for Mother. However,

> As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest.

*In re Kaliyah S.*, 455 S.W.3d at 556 (citations omitted).

> Among the factors that may be used to evaluate the reasonableness of the Department's reunification efforts are: (1) the reasons for removing the child from the parent's custody, (2) the parent's physical and psychological abilities and deficits, (3) the resources available to the parent, (4) the parent's response to and cooperation with the Department's reunification efforts, (5) the resources reasonably available to the Department,[3] (6) the duration and extent of the parent's efforts to address and remedy the conditions that required the removal of the child, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Benard T.*, 319 S.W.3d 586, 601 (Tenn. 2010). We do not have some of this information. What we do have is discussed throughout this opinion.

As to factor (L), the trial court said, "The Department did make reasonable efforts to assist the parents. Could the Department have done more, possibly. However, the parents did not successfully engage in the services offered as evidenced by their continued use of drugs. This factor weighs in favor of termination." It is true that the efforts of the department need not be herculean. *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006). "Reasonable efforts means doing everything reasonable, not everything possible." *In re Katia M.*, 6 A.3d 86, 98 (Conn. App. 2010) (quoting *In re Tabitha T.*, 51 Conn. App. 595, 600, 722 A.2d 1232, 1236 (1999)). The child was removed from the

---

[3] "However, the Department may not use budgetary concerns to justify its failure to use reasonable efforts to reunify parents and their children." *In re Bernard T.*, 319 S.W.3d at 601, n.31.

parents' custody for environmental and drug exposure reasons. The environmental problems were addressed with the parents' move to a suitable house and participation in homemaker services, mental health assessments, and parenting services.

As for the parents' drug use problems, the department had them take drug and alcohol assessments. Also, the department monitored Mother's participation in a suboxone program, a program she was using before the department intervened. Information about the program and Mother's participation in it are not developed in the trial testimony. The department placed both parents in a one- or two-month virtual intensive outpatient program ("IOP") consisting of videos and discussions. After the IOP, the parents still had positive drug tests. Mother testified that she wanted another drug program, but none were offered to her. She did not go looking for a drug program herself as she thought it had to be proposed by the department. Mother questioned the accuracy of her September 2024 drug test, but DCS did not retest her. Mother testified repeatedly that she completed every evaluation and program that was asked of her. Mother also testified without contradiction that she asked her caseworker three or four times if there were any other drug counseling services she could try, and she was told there were no more. Mother did make some changes in her conduct. For example, she testified that she no longer associated with people who use drugs. She also passed drug tests on January 7, 2025, and January 9, 2025. There is no Affidavit of Reasonable Efforts from the department in the record.[4]

Father maintains that DCS should have provided an interpreter and used other reasonable methods of communication. An interpreter was provided in court. However, providing a court interpreter is not always enough. "It bears emphasizing that before an agency can seek to terminate a parent's fundamental right to the custody and care of their child, it must ensure clear and precise communication so that the parent knows what they need to do and understands how the agency will assist them." *In the Matter of K.Y.Z.,* 2025 WL 2955728, at *9. For example, it is evident that Father did not understand the criteria

---

[4] Tenn. Code Ann. § 37-1-166(c) states:

> To enable the court to determine whether such reasonable efforts have been made, the department, in a written affidavit to the court in each proceeding where the child's placement is at issue, shall answer each of the following questions:
> (1) Is removal of the child from such child's family necessary in order to protect the child, and, if so, then what is the specific risk or risks to the child or family that necessitates removal of the child?;
> (2) What specific services are necessary to allow the child to remain in the home or to be returned to the home?;
> (3) What services have been provided to assist the family and the child so as to prevent removal or to reunify the family?; and
> (4) Has the department had the opportunity to provide services to the family and the child, and, if not, then what are the specific reasons why services could not have been provided?

for termination, even though he signed the required form. He testified he could not read and understand it. Yet, no document was provided to him in Spanish and there is no proof that DCS reviewed the criteria with him. In other Tennessee appellate cases, the department provided an interpreter to explain the criteria and translated copies of the document. *See In re Jose L.*, No. E2016-00517-COA-R3-PT, 2016 WL 6426774, at *2 (Tenn. Ct. App. Oct. 31, 2016) ("A DCS interpreter thoroughly explained the criteria and procedures for termination of parental rights and each of the permanency requirements [to] Father in Spanish, and DCS provided Spanish copies of each of the documents to Father."); *In re Agustine R.*, No. E2014-01091-COA-R3-PT, 2015 WL 1259245, at *1 (Tenn. Ct. App. Mar. 17, 2015).[5] Father testified that he took the classes DCS required, but "there were a lot of things" he did not understand. Father also testified that he asked a social worker for an interpreter, but "[n]o one ever got back" to him and that "no one ever communicated with me adequate." Father's testimony shows that at least some of the time Mother acted as his interpreter. Cases from other states indicate that having a relative or friend translate for someone may be adequate. *See In the Interest of S.J.*, 639 So.2d 183, 184 (Fla. Dist. Ct. App. 1994) (interpretation by a friend); *In the Matter of S.H.D.N.,* Nos. 1813 MDA 2024, 1814 MDA 2024, 1815 MDA 2024, 1816 MDA 2024, 2025 WL 2103695, at *10 (Pa. Super. Ct. July 28, 2025) (children's elder sibling assisted mother in communicating with county social services agency and agency used a telephone translation service). But it was not adequate in this case. Father testified to being "very confused" during the process. Father further testified that he did not understand until "[r]ecently right up until 2, maybe 3 weeks, is when I kinda started figuring out how grave this situation has become."

Appellate courts must presume that a trial court's factual findings are correct unless the evidence preponderates against the trial court's findings. *See* TENN. R. APP. P. 13(d). In my opinion, based on this record, DCS did not make reasonable efforts to assist the parents in making a lasting adjustment.

The best interest factors listed in Tenn. Code Ann. § 36-1-113(i) are:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

---

[5] Although Tenn. Code Ann. § 4-1-104 requires that all governmental agency communications and publications be in English, the Tennessee Attorney General has concluded that "to avoid constitutional challenge, a court would likely conclude that the statute does not forbid agency communications and publications in other languages as long as all such materials are also published in English." Tenn. Op. Att'y. Gen. No. 07-112 (July 24, 2007).

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Termination of parental rights should be a last resort, available only when all reasonable efforts to reunite the family have failed. "Not all parental misconduct is irredeemable." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). There is a possibility that termination of the parent's rights is not always in the child's best interests. *Id*. "[T]he facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). It is "a factually intensive undertaking." *Id*. "Any single factor may dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005).

The majority considers the reasonable efforts factor to be "but one factor to be considered among twenty factors in the best interest analysis." Yet, the reasonable efforts of DCS can affect many of the best interest factors. Thus, in this case, it is indeed the single factor that dictates the outcome of the analysis. *Id*. A review of the majority's analysis of the best interest factors shows that the pervasive problem for both parents is drugs. Their drug issues are involved in factors (A), (C), (D), (J), (K), (L), (M), (N), (O), (P), (Q), (R), and (T), over half of the best interest factors. In my opinion, on this record, DCS did not make reasonable efforts to assist the parents with their drug habits or Father with his language barrier, which affected his understanding of the drug course he took and the

overall importance of the process. The efforts of DCS as to their drug and language problems were minimal at best and minimal efforts are not diligent efforts. *Matter of K.Y.Z.*, 2025 WL 2955728, at *10. The rote response that drugs are the basis of the problem and that the parents did not do enough to "kick the habit" is a grotesque simplification. Many individuals go through two or more drug programs before they resolve their drug issues or before DCS decides to file for termination of their parental rights. *See In re Alizah S.*, No. E2025-00110-COA-R3-PT, 2025 WL 3235295, at *6 (Tenn. Ct. App. Nov. 19, 2025) ("Mother continued to test positive for drugs throughout the custodial episode, even after participating in three drug rehabilitation programs."); *In re Ethin E. S.*, No. E2011-02478-COA-R3-PT, 2012 WL 1948817, at *11 (Tenn. Ct. App. May 31, 2012) (Mother had "access to several different drug treatment programs.") Sometimes this takes several years. "[P]arents with drug addictions can have false starts and setbacks." *In re Ethan W.*, No. M2021-01116-COA-R3-PT, 2023 WL 415999, at *7 (Tenn. Ct. App. Jan. 26, 2023). DCS filed for termination of their parental rights just one year and two weeks from the date the child was taken into DCS custody. These parents, one who does not read English and understands maybe half of what he hears, went through only one DCS recommended drug program, done virtually and in English.

Based on this record, I cannot say that there is clear and convincing evidence that the best interests of the child require the termination of the parental rights of Mother and Father. I cannot even say that they received equal access to justice. What I can say is that a parent's fundamental right to raise a child should not be taken away after minimal DCS efforts at rehabilitation or with procedures and forms that the parent does not understand. I commend my colleagues in the majority for recognizing DCS's failures regarding providing Father with an interpreter earlier in the process, but they do not go far enough. As part of their reasonable efforts, DCS should evaluate every non-native, English-speaking parent for English proficiency and supply those who need help understanding with interpreters and appropriate documents in the language they do understand.

My view of this case does not require the immediate return of the child to Mother and/or Father. It does not prohibit future termination proceedings should they become necessary. Rather, it is a determination that, due to DCS's lack of reasonable efforts, I cannot, on this record, find that there is clear and convincing evidence that the best interest of the child requires that the parents' parental rights should be terminated. The case should be remanded for further proceedings. I respectfully dissent.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE