IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 23, 2025 Session

## IN RE BRAXTON M.

**Appeal from the Chancery Court for Gibson County**
**No. 24741    Michael Mansfield, Chancellor**

———————————————————————

**No. W2024-00762-COA-R3-PT**

———————————————————————

VALERIE L. SMITH, concurring in part, and dissenting in part.

It is often said that "hard cases make bad law." This case is more than hard — it is tragic. In circumstances such as these, which evoke strong emotions, this Court must resist the temptation to bypass the limits of our appellate review and re-try cases and re-evaluate facts to achieve what some deem to be a more just result. Unfortunately, in my view, the majority's opinion does exactly this – essentially abrogating the role of the trial judge as a factfinder. Specifically, the majority opinion reverses the trial court's determination that no grounds existed for termination, reverses the trial court's conclusion that termination of parental rights is not in Braxton's ("the Child's") best interest, reverses factual findings made by the trial court, and even disregards credibility findings made by the trial court.

I agree that clear and convincing evidence exists to establish abandonment under Tennessee Code Annotated section 36-1-102(1)(A)(i). The majority and I then choose different paths. Although I would reverse the trial court's ruling as to abandonment, I would affirm in all other respects. In my view the majority ignores the presumption of correctness in the standard of review and does not give sufficient weight to the trial court's credibility findings to travel the path they deem just. I do not agree that the evidence preponderates against the trial court's findings of fact, nor that the aggregation of the individual facts amounts to clear and convincing evidence that termination of Father's parental rights is in the Child's best interest.

## A. **Additional Relevant Facts**

While the majority describes the facts of this case in great detail, the opinion abbreviates or omits other facts that I find pertinent. I first address the order of protection cited repeatedly in the majority's opinion. I agree that Mother and Father did not have a good relationship while married. According to Father, he needed the order of protection from Mother at that time because of "everything that was going on," including Mother

physically trying to gain access to the house through a locked door that she had a key to, Mother's mood swings, and the fact that "she was supposed to also be taking medication to help with her anxiety, postpartum, and bipolar, and she refused to take her medication," and she was "exploding." Mother acknowledged her own alarming behavior when asked at trial.

The majority implies that Father knew, or should have known, that the mechanical issues with the truck were lethal. Father, Mother, and both children had ridden in the vehicle on many occasions, including for a ten-hour road trip, without issue. Father was aware that the truck had a leak in the exhaust – as was Mother – but he was completely unaware that it presented a danger to his children or anyone spending time inside the truck. There was no proof at trial that anyone knew that the exhaust leak could or would cause carbon monoxide to fill the cabin of the truck. Moreover, the trial court made a specific finding that "neither [Father] nor Mother had knowledge of or any reason to know that the truck . . . had a carbon monoxide leak which might result in severe bodily harm to the children."

The majority minimizes the role Father played in the Child's life prior to Brother's death, his incarceration, and subsequent acquittal. Several people that knew both Mother and Father testified that Father and the Child had a loving and close relationship before the incident, and that they did not have concerns for the Child's wellbeing if he were to be around his Father again. Witness Tyler Nehaus had been friends with Father for more than ten years. The two met while in the military. He testified that he was a frequent visitor to the parties' household before the incident, and that Father was always "great" with his children. Mr. Nehaus stated that he would have left his own children with Father. Mr. Nehaus remained friends with Father and observed his parenting of the Child after the incident. He testified that after the incident Father "had heightened senses [ ], awareness." He "looked out" for the Child and "made sure he had everything he needed. Sometimes he probably . . . had more than what he needed." While admitting that he did not believe he would have left his own children alone in a car, when specifically asked about the type of care that Father provided to the Child after his brother passed away, Mr. Nehaus described it as "exceptional."

A former colleague of Father's, Ronald "Troy" Carter, worked with Father at the Jackson Police Department and was a frequent guest in the parties' home while they were married. Mr. Carter described Father as "always around the boys, [he] always had the boys with him. He was really close to the boys." Mr. Carter testified that he would not have expected Father to leave the children alone in the truck, but that Father "made an honest - - he made a mistake, the way that I see it, and he owned up to the mistake that he made." When asked whether there was "anything or any reason you know of why [Father] should not or would not be able to be a good father to [the Child], even in spite of everything that's happened here," Mr. Carter replied "No, sir."

- 2 -

I think that it also bears repeating that Mother testified during this trial that she "wanted justice" for Brother and feels that he "was failed." She testified that she blames Father all the while acknowledging that the cause of Brother's death was accidental carbon monoxide exposure. I cannot imagine how Mother feels at the loss of a son – accidental or otherwise. Considering the state of her broken relationship with Father when the incident occurred, Mother's feelings may be even more understandable. This Court's role in termination proceedings, however, is not a punitive one.

## B. Standard of Review

The law stated in the majority's opinion is not the source of my quarrel.[1] While the majority correctly states the standard of review, I feel their application exceeds the authority of this Court and is akin to a strictly de novo review without a presumption of correctness and does not give appropriate weight to the trial court's credibility findings. I see this Court's role differently – as one of review and error-correction, not an opportunity for a retrial on the appellate record.

### 1. Amber Julian

A substantial amount of the majority's opinion rises and falls on their own determination that Amber Julian's (referred to as the "dispatcher" by the majority) testimony is more credible than Father's. The trial court, however, made an implicit credibility finding that all but dispensed with Ms. Julian's version of events. The court found Father to be credible and determined that Father rendered aid to brother as soon as he realized there was a medical emergency. According to the majority, it is notable that "the trial court's discussion of the dispatcher's testimony was remarkably limited." I do not find it to be that notable. Rather, it seems entirely consistent with the trial court's belief that Father was telling the truth. Ms. Julian was, after all, impeached on at least two occasions by her own prior inconsistent statements.

The majority uses documentary evidence – such as time stamps and a cold transcript – to completely undo what the factfinder believed to be true after the personally observing the witnesses. In fact, the majority's review of Amber Julian's credibility is more akin to

---

[1] To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, No. W2011-02520-COA-R3-PT, 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012). When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

the standard of review for documentary evidence, which is reviewed de novo, rather than for live witnesses, which is afforded incredible deference on appeal. *In Re Angelleigh R.*, No. M2020-00504-COA-R3-JV, 2021 WL 1994033, at *6 (Tenn. Ct. App. May 19, 2021).

Amber Julian was a live witness that testified in front of the trial court judge. Father was also a live witness who testified in front of the trial judge. As such, the trial judge had the opportunity to observe each person's mannerisms, tone of voice, plausibility, demeanor, and other nuances that are completely unavailable to an appellate court. For those reasons, we are duty-bound to give considerable deference to the trial court's credibility assessments on appeal. The majority's unwarranted reversal of the credibility findings on Father and Ms. Julian oversteps this Court's role in the appellate process and represents a substantial shift away from long-standing precedent. *See In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (In the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." (internal citations omitted).; *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (This Court "gives great weight to the credibility accorded to a particular witness by the trial court.").

2.    Mother and Stepfather

Included in the trial court's ruling is a finding that Mother's and Stepfather's fears of reuniting the Child with Father are "unreasonable" and that their motivation is to have "this Court punish [Father] . . . when a Madison County jury would not." The majority addresses this only in its best interest analysis and finds this to be neutral and not applicable to the Child's best interest. In my view, it represents the motivations of Appellants as succinctly as possible. By finding that their allegations of fear to be an effort to punish Father, the trial court makes an implicit credibility finding that must be given great weight rather than rendered inapplicable.

3.    Father

Throughout the trial court's order, its holding both explicitly and implicitly finds Father to be credible. The majority goes so far as to say that Father has "demonstrated a willingness to lie." The majority makes its own determination of Father's credibility without giving any weight to the trial court's findings.

C. **Best Interests**

"Not all parental misconduct is irredeemable. Thus, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Audrey S.*, 182 S.W.3d 838, 877

(Tenn. Ct. App. 2005). When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *Id.*; *see also In re Carrington*, 483 S.W.3d 507, 523 (Tenn. 2016) ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated section 36-1-113(i) contains a nonexclusive list of best interest factors for a court to consider.

I disagree with the majority's best interest analysis. I find their analysis contains a desire for retribution and does not properly consider that time has moved on since the trial court's ruling. I completely agree that Father made a tragic and terrible decision to leave the children unattended. I do not agree that there is clear and convincing evidence to forever terminate his relationship with the Child.

The majority takes issue throughout its analysis to point out different homes that the Child lived in with Father while discounting that Mother played a role in the same instability and moved just as many times if not more. The majority repeatedly cites the order of protection granted Father while never addressing that Mother's behavior led to same and that her own testimony acknowledged that. In sum, the best interests of Mother rather than the Child are addressed. The majority speaks of her being "terrified" while giving no weight to the trial court's finding – that was echoed by several witnesses – that the Child will be safe in Father's care. Virtually none of the trial court's findings are acceptable to the majority. Further, most if not all the majority's findings assume that Father and the Child have had no contact since the trial court's ruling.

### D. **Motions**

Motions to this Court have been made by both parties during the pendency of this appeal that not only deserve further discussion but also make it clear that the majority's opinion relies on facts that are no longer reality. If the ultimate goal is to protect a parent's fundamental right to parent their child and to protect the child's best interests, it is inexplicable why we are basing the future of this entire family on facts that are no longer true and on circumstances we now know have changed.

Mother filed Appellants' Expedited Request for Stay of Related Proceedings Pending Outcome of Appeal on March 19, 2026. The majority granted the motion by way of Order on March 23, 2026. I was not in favor of granting the motion. At the outset, the motion does not comply with Rule 7 of the Tennessee Rules of Appellate Procedure. Further the rule states in pertinent part "[t]he other parties may promptly file an answer." I would have allowed more time for an answer.

A Motion to Vacate Order Granting Stay was filed on March 25, 2026. The majority

denied the motion by order of March 27, 2026.  Contained in the pleading is information highly relevant to this matter.  I first note the statement that Father's attorney was in the process of preparing a response.  Second, this is the FIRST time a stay or review of a stay has been requested of this Court — almost two years after the trial court's order denying the petition for termination of parental rights and for stepparent adoption.  Third, and most importantly, the pleading apprises this court of reunification proceedings between Father and the Child that have occurred since July 2025.  I would have granted the Motion to Vacate Order Granting Stay. The majority addresses other pending motions in footnote 13 and denies those as moot.  Rather than view the facts presented to us in their briefs and at oral argument in a vacuum, I would have on our own motion requested a transcript from the trial court on the question of the stay pursuant to Rule 7.  I would then have determined whether post judgment facts should be considered here.

Time has not stood still during our review.  Indeed, the trial court moved forward with this matter after its dismissal of the Petition under review, and the dismissal of a subsequent petition now pending review before this court in case No. W2025-01768-COA-R3-PT.

I find it appropriate at this time to address the majority's inclusion of footnote one.  It goes without saying that two out of three judges must agree to form a majority.  I respect the decision of my learned colleagues as I am sure they do mine.  I note this only to say that this matter has not languished for lack of consideration.  We have each come to our respective positions with careful thought and study.  For my part, my position remains steadfast.

### E. <u>Conclusion</u>

Termination of parental rights should be a last resort, available only when all reasonable efforts to reunite the family have failed. "Not all parental misconduct is irredeemable." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). There is a possibility that termination of the parent's rights is not always in the child's best interests. Id. "[T]he facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017). It is "a factually intensive undertaking." Id.

While my disagreement with the majority opinion is multi-faceted, the simplest end to my analysis is that in these circumstances I do not consider Father's conduct irredeemable and would ultimately affirm the trial court.  In my view, this case largely hinges on credibility.  I would hold that the trial judge considered the testimony and made findings supported by the record.  My own review of the record supports those findings.  Outside of this case, the majority's application of the standard of review represents a degradation of both the presumption of correctness and a trial court's credibility findings.  The implications of that shift in this Court's review are of great consequence.

Mother's desire to remove Father from the Child's life overshadows the Child's best interests. The majority opinion focuses on her feelings and best interest rather than the Child's. The grief felt and tears shed here are undoubtedly immeasurable. Given the factors we are directed to consider by our Supreme Court and the General Assembly, I do not agree that the record demonstrates clear and convincing proof that termination is in the Child's best interest. I fully agree that Father made a foolish decision to leave his children in his truck while he attended personal grooming appointments. I also fully agree with the trial court that that behavior is not likely to happen again. By determining that Father and the Child's relationship shall be forever terminated, the majority buttresses one tragedy with another. I believe they chose the wrong path. I respectfully dissent.


s/ Valerie L. Smith
VALERIE L. SMITH, JUDGE